IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| RAND CONSTRUCTION COMPANY, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) |
| | ) |
| DEARBORN MID-WEST CONVEYOR CO., | ) |
| | ) Case No.: 11-CV-2479-JTM-JPO |
| **Defendant/Third Party Plaintiff,** | ) |
| | ) |
| and | ) |
| | ) |
| ARCH ENVIRONMENTAL EQUIPMENT, INC. | ) |
| | ) |
| **Third-Party Defendant.** | ) |

## MEMORANDUM IN SUPPORT OF PLAINTIFF RAND CONSTRUCTION COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the District Court of Kansas, Rand Construction Company ("Rand") submits the following memorandum in support of its motion for partial summary judgment.

### Introduction

This case involves claims arising out of the design, fabrication and installation of a coal-delivery system. Rand filed this action against the Dearborn Mid-West Conveyor Company ("Dearborn") to recover damages it sustained as the result of the failure of the conveyor system provided by Dearborn. Because the undisputed facts establish the elements of its causes of action for breach of contract and indemnification, Rand moves for partial summary judgment.

### Nature of the Case

On or about April 28, 2009, the Air Force issued Solicitation No. FA 5004-09-R-C00, which included drawings and specifications. The scope of work was to construct Project FTQW-

07-1024 ("Project") at Eielson Air Force Base located near Fairbanks, Alaska. The work included the repair, replacement and/or installation of certain equipment at the site. On or about September 11, 2009, Three Phase Electrical, Inc. ("Three Phase") was awarded the contract for the Project. On or about September 14, 2009, Rand entered into a contract with Three Phase to perform the demolition of the existing conveyor system used to transport coal and install new conveying equipment.

Dearborn submitted a proposal in response to Rand's solicitation for bids to design, fabricate and supply the new conveyor system equipment for transporting coal stating that its "offer is generally in compliance with the specifications issued with the request for proposal dated May 9, 2009." On October 7, 2009, Rand entered into a purchase order contract with Dearborn wherein Dearborn agreed to provide the conveying equipment, which complied with the drawings and specifications included in Solicitation No. FA 5004-09-R-C007, to be installed by Rand in the power plant at Eielson Air Force Base.

After Rand removed the existing conveying equipment, the new conveying equipment provided by Dearborn was installed. When Rand attempted to start and run the new equipment, the system failed causing serious coal "back-up" and spillage problems. To make the system operational, Rand incurred expenses totaling $216,546.03 for labor, material and subcontract costs. Rand was also assessed the sum of $766,000.00 for the failure to deliver a fully operational conveying system within the time required by the contract documents. In addition, Rand has incurred attorneys fees as a result of the events described in this lawsuit.

Count I of Rand's Complaint states that pursuant to its purchase order contract with Rand, Dearborn was to design and supply a conveying system that would meet the performance requirements as set forth in the drawings and specifications included in Solicitation No. FA

2

5004-09-R-C007; Dearborn breached the purchase order contract with Rand because the conveying equipment failed to perform; and, as a direct and proximate result of the foregoing breach of contract, Rand was damaged.

Count II further states that Dearborn had a duty to use ordinary care when designing and supplying the conveying system; Dearborn breached such duty by failing to design and supply conveying equipment which would meet the performance requirements as set forth in the drawings and specifications included in Solicitation No. FA 5004-09-R-C007; and, as direct and proximate result of the foregoing negligent conduct by Dearborn, Rand was damaged.

In Count III, Rand seeks indemnification from Dearborn under the terms of the purchase order contract because the conveying system provided by Dearborn caused "claims, damages, losses and expenses, including but not limited to attorney's fees arising out of or resulting from performance of the Supplier's Work under this Purchase Order Agreement."

As the following discussion will demonstrate, the undisputed facts establish each and every element of Rand's causes of action for breach of contract (Count I) and indemnification (Count III). Therefore, Rand respectfully requests this Court to grant its motion for partial summary judgment.

### Statement of Uncontroverted Material Facts

1.      On or about April 28, 2009, the Department of the Air Force, 354 Contracting Squadron, 354 Broadway St., Unit 53, Eielson, AFB, Alaska 99702, issued Solicitation No. FA 5004-09-R-C007. (Attachment A, Affidavit of Lawrence P. Grant, para. 4, and Exhibit 1 to Attachment A).

2.      The scope of work was to construct project FTQW-07-1024; automate Coal Bunker OPS, Central Heat and Power Plant (CH+PP) in accordance with the drawings and

3

specifications and to furnish, fabricate, and install all labor, material, equipment, supervision, work and facilities necessary to complete project FTQW07-1024; and, repair Coal Bunker OPS, CH+PP, hereinafter referred to as the "Project." (Attachment A, Affidavit of Lawrence P. Grant, para. 6, and Exhibit 1 to Attachment A).

3.    All work was to be performed strictly in accordance with the drawings and specifications included in Solicitation No. FA 5004-09-R-C007. (Attachment A, Affidavit of Lawrence P. Grant, para.7, and Exhibit 1 to Attachment A).

4.    With regard to v-plows and lift tables, "Part 4 – Design Criteria" of the specifications included in Solicitation No. FA 5004-09-R-C007 provides, in pertinent part:

4.01    The following design criteria applies:

* * *

I.    The Owner will operate the coal handling systems twice daily; however, all components shall be designed for continuous, severe, heavy duty, minimum maintenance, 24 hours per day, 365 days per year operation in a coal –fired power plant environment.

J.    The conveyor system shall be designed to minimize spillage.

(Exhibit 2 to Attachment A, Affidavit of Lawrence P. Grant, pp. M-002-4 and M-002-5).

5.    On or about September 11, 2009, Three Phase Electrical, Inc.("Three Phase") was awarded the prime contract for the Project, which consisted of Solicitation No. FA 5004-09-R-C007 and included all drawings and specifications attached to Solicitation No. FA 5004-09-R-C007.( Attachment A, Affidavit of Lawrence P. Grant, para. 9).

6.    On or about September 14, 2009, Rand Construction entered into a contract with Three Phase to perform the demolition of the existing conveyor system and install new conveying equipment. (Attachment A, Affidavit of Lawrence P. Grant, para. 10, and Exhibit 3 to Attachment A).

4

7.    Rand sought bids for design and supply of new conveying equipment to be installed in the utility plant at Eielson Air Force Base. (Attachment A, Affidavit of Lawrence P. Grant, para. 12).

8.    Dearborn was provided with a copy of Solicitation No. FA 5004-09-R-C007 including all drawings and specifications. (Attachment A, Affidavit of Lawrence P. Grant, para. 13).

9.    Dearborn responded by providing to Rand DMW Proposal No. B-41267-A1 May 2009 for "Eielson AFB-Rand Construction Automate Coal Bunker OPS, CH&PP Alaska." (Attachment A, Affidavit of Lawrence P. Grant, para. 14, and Exhibit 4 to Attachment A).

10.    The letter authored by Sudy L. Vohra, Executive Vice-President and General Manager of Dearborn, dated June 8, 2009, which references Eielson AFB and DMW Proposal No. B-41267-A1, states in relevant part:

> We are pleased to submit our proposal, one (1) original, one (1) copy and one(1) electronic copy for the design, fabrication, and delivery of the Material Handling System for the above referenced project.
>
> Our offer is generally in compliance with the specifications issued with the request for proposal dated May 9, 2009 and amendments 1, 2 and 3. Our clarifications and exceptions are listed in Appendix F to our proposal. ...

(Exhibit 5 to Attachment A, Affidavit of Lawrence P. Grant, para. 16).

11.    "Appendix F" is attached as "Exhibit 6" to the Affidavit of Lawrence P. Grant.

12.    Rand contracted with Dearborn to provide a plow system that met the project specifications and performed properly. (Attachment A, Affidavit of Lawrence P. Grant, para. 19, and Exhibit 5 to Attachment A).

13.     On or about October 7, 2009, Rand into a purchase order contract with Dearborn under which Dearborn was to "design, fabricate and supply" the new conveying equipment to Rand Construction. (Attachment A, Affidavit of Lawrence P. Grant, para. 20, and Exhibit 7 to Attachment A).

14.     The "Terms and Conditions of the Purchase Order Agreement" provide:

**Indemnification**

> To the fullest extent permitted by law, the Supplier shall defend, indemnify and hold harmless the Owner and Contractor and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from performance of the Supplier's Work under this Purchase Order Agreement, but only to the extent caused in whole or in part by acts or omissions of the Supplier, the Supplier's Sub-suppliers, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder. ... ;

(Exhibit 7 to Attachment A, Affidavit of Lawrence P. Grant).

15.     Lawrence Grant, Rand's representative, met with Dearborn's representative, Jim Smothers, to sign the purchase order contract. (Attachment A, Affidavit of Lawrence P. Grant, para. 22).

16.     Mr. Grant and Mr. Smothers discussed the schedule for delivering the new conveyor equipment to the Project site. (Attachment A, Affidavit of Lawrence P. Grant, para. 22).

17.     Mr. Grant also discussed with Mr. Smothers the assessment of liquidated damages based upon late delivery of the new conveyor equipment. (Attachment A, Affidavit of Lawrence P. Grant, para. 23).

6

18.     Mr. Grant was told by Mr. Smothers that Dearborn was excluding liquidated damages due to delivery delays. (Attachment A, Affidavit of Lawrence P. Grant, para. 24).

19.     There is no specific language in Appendix F, attached hereto as "Exhibit 6," or any other part of Dearborn's proposal, which excludes liquidated damages for failure of the new conveyor system to perform as required by the contract documents. (Attachment A, Affidavit of Lawrence P. Grant, para. 25, and Exhibits 4 and 6 to Attachment A).

20.     DMW Proposal No. B-41267-A1, is part of the contract between Rand and Dearborn. (Attachment A, Affidavit of Lawrence P. Grant, para. 26, and Exhibits 4 and 6 to Attachment A).

21.     The power plant at Eielson Air Force Base was shut down in mid-June of 2010 so that Rand could remove the existing conveying equipment and then install the new conveying equipment supplied by Dearborn. (Attachment A, Affidavit of Lawrence P. Grant, para. 27).

22.     On or about June 26, 2010, Rand attempted to start and run the new conveying equipment supplied by Dearborn. (Attachment A, Affidavit of Lawrence P. Grant, para. 28).

23.     The new conveying equipment failed to perform in that serious coal "back-up" and spillage problems occurred. (Attachment A, Affidavit of Lawrence P. Grant, para. 29).

24.     As part of its design and supply services to Rand, Dearborn solicited and received a quote from Arch for a multi-plow system with lift tables and controls. (Attachment B, Doc. 4 - Third-Party Petition, para. 7).

25.     Dearborn issued a purchase order to Arch to design and supply plows for the Project. (Attachment B, Doc. 4 - Third-Party Petition, para.8).

26.     Arch designed and supplied the plows to Dearborn as part of Dearborn's services to Rand on the Project. (Attachment B, Doc. 4 - Third-Party Petition, para. 9).

27.     Mr. Lloyd Sanders was the Project Manager of Dearborn. (Attachment C, Deposition of Larry Harp, page 21, lines 15-17).

28.     Mr. Lloyd Sanders prepared a time line of the events giving rise to this lawsuit. (Attachment C, Deposition of Larry Harp, page 165, lines 15-23; Attachment D, Deposition Exhibit 52).

29.     Mr. Jesse Sanchez was the Project Engineer for Dearborn. (Attachment E, Deposition of Jesse Sanchez, page 14, lines 5-7).

30.     Mr. Robert Shelton was Dearborn's liaison and field representative for the Project (Attachment F, Deposition of Robert Shelton, page 27, Lines 22-25, page 28, Line 1, page 30, Lines 6-15, Attachment C, Deposition of Larry Harp, page 135, lines 12-15).

31.     Part of Mr. Shelton's duties was to make sure the conveyor was installed the way it was designed. (Attachment F, Deposition of Robert Shelton, page 30, lines 24-25, page 31, lines 1-2).

32.     On June 26, 2010, the conveyor was run with coal experienced spillage and other problems as more fully outlined in Robert Shelton's email letter of June 28, 2010, which is incorporated herein by reference. (Attachment G, Deposition Exhibit 37).

33.     Mr. Shelton stated that "[the conveyor system's] performance was not acceptable." (Attachment F, Deposition of Robert Shelton, page 98, lines 3-11).

34.     Mr. Shelton further testified that there "was no problem with the installation" of the "new v Plow and lift tables delivered by Arch" and installed by Rand and that "[Rand] did a very good job." (Attachment F, Deposition of Robert Shelton, page 123, lines 20-25, page 124, lines 1-3).

8

35.    The original lift tables and plows did not perform properly. (Attachment C, Deposition of Larry Harp, page 16, lines 14-22).

36.    The original V-Plow system did not work as intended (Attachment E, Deposition of Jesse Sanchez, page 165, lines 22-23, page 166, line 2).

37.    The revised or modified V-Plow system worked as intended.  (Attachment E, Deposition of Jesse Sanchez, page 166, lines 4 through 11).

38.    The attempts made to modify the original plows and tables were unsuccessful. (Attachment H, Deposition Exhibit 39; Attachment I, Deposition Exhibit 40; Attachment D, Deposition Exhibit 52).

39.    The original plows and lift tables did not function as specified in that the lift tables and plows failed to properly remove material from the conveyor belt.  (Attachment J, Letter of October 8, 2010 by Lloyd Sanders, Deposition Exhibit 60; Attachment K, Deposition Exhibit 51; Attachment D, Deposition Exhibit 52).

40.    The plow angle was the root cause.  (Attachment F, Deposition of Robert Shelton, page 126, lines 3-7).

41.    A new V-Plow and lift tables were delivered by Arch. (Attachment F, Deposition of Robert Shelton, page 123, lines 20-22).

42.    New V-Plows and new narrower tables were installed resulting in the conveyor system properly diverting the coal.  (Attachment L, Lloyd Sanders email letter of July 9, 2010, Deposition Exhibit 50; Attachment F, Deposition of Robert Shelton, page 98, lines 12-15).

43.    The new plow system effectively and efficiently moved the coal to the bunkers. (Attachment F, Deposition of Robert Shelton, page 98, lines 22-24, page 99, lines 2-9).

44. With the new sharp plow and the other transition areas that were made, narrower table, the system was working appropriately, the coal was effectively conveyed to the bunkers. (Attachment F, Deposition of Robert Shelton, page 122, lines 4-12).

45. To fix the problems, new tables and new plows were built by Arch and installed by Rand. . (Attachment F, Deposition of Robert Shelton, page 123, lines 20-24).

46. On or about July 7, 2011, the new conveying system was operational and accepted by the Air Force. (Attachment A, Affidavit of Lawrence P. Grant, para. 30).

47. To make the system operational, Rand incurred expenses totaling $216,546.03 for labor, material and subcontract costs. (Attachment A, Affidavit of Lawrence P. Grant, para. 31).

48. In addition, Rand was assessed the sum of $766,000.00 as the result of the 10-day delay in providing the Air Force with a fully operational conveying system within the time required by the contract documents. (Attachment A, Affidavit of Lawrence P. Grant, para. 32, and Exhibit 8 to Attachment A).

49. Rand has incurred, and will continue to incur, attorneys fees as the result of the events referenced in this lawsuit. (Attachment A, Affidavit of Lawrence P. Grant, para. 33).

50. Dearborn has refused to compensate Rand for the "claims, damages, losses and expenses, including but not limited to attorney's fees" arising out of or resulting from the failure of the new conveyor equipment supplied by Dearborn. (Attachment A, Affidavit of Lawrence P. Grant, para. 34).

## Arguments and Authorities

### I.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue of material fact" and that the party is entitled to "judgment as a matter of law."

Fed. R. Civ. P. 56(c) (2004). An issue is "genuine" if sufficient evidence exists on each side "so that a rational trier of fact could resolve the issue either way" and "[a]n issue is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir.1998) (citations omitted).

If the movant has the burden of proof on a claim or defense raised in a summary judgment motion, it must show that the undisputed facts establish every element of the claim or defense. *Crane Construction Co. v. Klaus Masonry,* 71 F.Supp.2d 1125, 1127 (D.Kan. 1997). Once the moving party meets its burden, the burden shifts to the non-moving party to identify specific facts that show the existence of a genuine issue of material fact. *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).

Finally, summary judgment is not a "disfavored procedural shortcut." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986). It is an important procedural vehicle "designed to secure the just, speedy and inexpensive determination of every action." *Id.*

Under the guidance of the foregoing standards, the Court's attention is directed to the arguments and authorities submitted in support of Rand's request for partial summary judgment.

**II.    Rand has met its burden of demonstrating the absence of a genuine issue of material fact as to the elements of its cause of action for breach of contract and entitlement to judgment as a matter of law. Therefore, partial summary judgment should be entered in Rand's favor on Count I.**

Rand seeks partial summary judgment as to Rand's liability on its breach of contract claim. Specifically, Rand seeks the Court's ruling that as a matter of law, Dearborn breached the purchase order contract by supplying conveyor equipment that failed causing serious coal "back-

up" and spillage problems to occur and that Dearborn is liable for Rand's actual costs resulting from the failure including the sum assessed against Rand as the result of the 10-day delay in providing the Air Force with a fully operational conveying system within the time required by the contract documents. The parties have stipulated in the Pretrial Order (Doc. 46) that the laws of Kansas apply to the substantive issues in this case.

### A.    Applicable Kansas Law

As a general rule, the interpretation or construction and the meaning and legal effect of written instruments are matters of law exclusively for the court and not questions of fact for determination by the jury. *Cline v. Southern Star Cent. Gas Pipeline, Inc.*, 356 F.Supp.2d 1203, 1216 (D.Kan. 2005).

Under Kansas Law, a party bringing a breach of contract claim has the burden to show: (1) the existence of a contract between the parties; (2) consideration; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) defendant's breach of the contract; and (5) damages to plaintiff caused by the breach. *Id.*

### B.    Undisputed Facts Establish Each Element of the Breach of Contract Claim

With regard to the first two elements, there is no dispute that a contract exists between the Rand and Dearborn and there is no assertion that the contract is void for lack of consideration. (Attachment B, Doc. 4 - Counterclaims, paras. 5-7).

As to the third element – Rand's performance or willingness to perform in compliance with the contract – Dearborn was paid $792,560 by Rand. (Attachment B, Doc. 4 - Counterclaims, paras. 5-7). But for the failure of the conveyor system, the $316,660 balance would have also been paid by Rand (Attachment A, para. 29)

In addition, Mr. Shelton, Dearborn's liaison and field representative for the Project, testified that there "was no problem with the installation" of the "new v Plow and lift tables

12

delivered by Arch" and that "[Rand] did a very good job." (Attachment F, Deposition of Robert Shelton, page 123, lines 20-25, page 124, lines 1-3).

As to the forth element, there is no question that Dearborn agreed to design and supply a conveying system that would meet the performance requirements as set forth in the drawings and specifications included in Solicitation No. FA 5004-09-R-C007and that Dearborn breached the purchase order contract with Rand because the conveying equipment failed to perform.

Directing the court's attention once again to the undisputed facts, Dearborn was provided with a copy of Solicitation No. FA 5004-09-R-C007, including all drawings and specifications. (Attachment A, para. 13). Dearborn responded by providing to Rand "DMW Proposal No. B-41267-A1 May 2009" for "Eielson AFB-Rand Construction Automate Coal Bunker OPS, CH&PP Alaska." (Attachment A,  para. 14, and Exhibit 4). The letter authored by Sudy L. Vohra, Executive Vice-President and General Manager of Dearborn, dated June 8, 2009, which references Eielson AFB and DMW Proposal No. B-41267-A1, states in relevant part:

> We are pleased to submit our proposal, one (1) original, one (1) copy and one(1) electronic copy for the design, fabrication, and delivery of the Material Handling System for the above referenced project.
>
> Our offer is generally in compliance with the specifications issued with the request for proposal dated May 9, 2009 and amendments 1, 2 and 3. Our clarifications and exceptions are listed in Appendix F to our proposal. ...

(Attachment A, para. 16).

Rand contracted with Dearborn to provide a plow system that met the project specifications and performed properly. (Attachment A, , para. 19, and Exhibit 5). On or about October 7, 2009, Rand into a purchase order contract with Dearborn under which Dearborn was to "design, fabricate and supply" the new conveying equipment to Rand Construction. (Attachment A,  para. 20, and Exhibit 7).

The power plant at Eielson Air Force Base was shut down in mid-June of 2010 so that Rand could remove the existing conveying equipment and then install the new conveying equipment supplied by Dearborn. (Attachment A, para. 27). On or about June 26, 2010, Rand attempted to start and run the new conveying equipment supplied by Dearborn. (Attachment A, para. 28).The new conveying equipment failed to perform in that serious coal "back-up" and spillage problems occurred. (Attachment A, para. 29).

As part of its design and supply services to Rand, Dearborn solicited and received a quote from Arch for a multi-plow system with lift tables and controls. (Attachment B, Doc. 4, Third-Party Petition, para. 7). Dearborn issued a purchase order to Arch to design and supply plows for the Project. (Attachment B, Doc. 4, para.8). Arch designed and supplied the plows to Dearborn as part of Dearborn's services to Rand on the Project. (Attachment B, Doc. 4, para. 9).

Mr. Robert Shelton was Dearborn's liaison and field representative for the Project. (Attachment F, page 27, Lines 22-25, page 28, Line 1, page 30, Lines 6-15, Attachment C, page 135, lines 12-15). Part of Mr. Shelton's duties was to make sure the conveyor was installed the way it was designed. (Attachment F, page 30, lines 24-25, page 31, lines 1-2).

On June 26, 2010, the conveyor was run with coal experienced spillage and other problems as more fully outlined in Robert Shelton's email letter of June 28, 2010, which is incorporated herein by reference. (Attachment G, Deposition Exhibit 37). Mr. Shelton stated that "[the conveyor system's] performance was not acceptable." (Attachment F, page 98, lines 3-11).

The original lift tables and plows did not perform properly. (Attachment C, page 16, lines 14-22). The original V-Plow system did not work as intended. (Attachment E, page 165, lines 22-23, page 166, line 2). The attempts made to modify the original plows and tables were unsuccessful. (Attachment H, Deposition Exhibit 39; Attachment I, Deposition Exhibit 40;

Attachment D, Deposition Exhibit 52). The original plows and lift tables did not function as specified in that the lift tables and plows failed to properly remove material from the conveyor belt. (Attachment J, Deposition Exhibit 60; Attachment K, Deposition Exhibit 51; Attachment D, Deposition Exhibit 52).

New V-Plows and new narrower tables were delivered and installed resulting in the conveyor system properly diverting the coal. (Attachment F, page 123, lines 20-22; Attachment L, Lloyd Sanders email letter of July 9, 2010, Deposition Exhibit 50; Attachment F, Deposition of Robert Shelton, page 98, lines 12-15). The new plow system effectively and efficiently moved the coal to the bunkers. (Attachment F, page 98, lines 22-24, page 99, lines 2-9, page 122, lines 4-12). On or about July 7, 2011, the new conveying system was operational and accepted by the Air Force. (Attachment A, para. 30).

Thus, there is no genuine issue of material fact as to Rand's breach of the parties' purchase order contract.

Finally, as to the last element – damages to Rand caused by the breach – the material facts are also undisputed. To make the conveyor system operational, Rand incurred expenses totaling $216,546.03 for labor, material and subcontract costs. (Attachment A, para. 31). In addition, Rand was assessed the sum of $766,000.00 as the result of the 10-day delay in providing the Air Force with a fully operational conveying system within the time required by the contract documents. (Attachment A, para. 32, and Exhibit 8). Moreover, Rand has incurred, and will continue to incur, attorneys fees as the result of the events referenced in this lawsuit. (Attachment A, para. 33).

Applying Kansas law to the undisputed facts, Rand has shown the absence of a genuine issue of material fact as to the elements of its cause of action for breach of contract and

entitlement to judgment as a matter of law. Accordingly, partial summary judgment should be entered in Rand's favor on Count I.

**III.    Partial summary judgment should be entered in favor of Rand on Count III because Rand has met its burden of demonstrating that under the terms of purchase order contract, Dearborn is required to indemnify Rand as a matter of law for "claims, damages, losses and expenses, including but not limited to attorney's fees."**

Rand further seeks a ruling from the Court that Dearborn is required pursuant to the terms of the purchase order contract to indemnify Rand for "claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from performance of [Dearborn's] Work under [the] Purchase Order Agreement," which includes $216,546.03 Rand paid for labor, material and subcontract costs, $766,000.00 assessed against Rand as the result of the 10-day delay in providing the Air Force with a fully operational conveying system and attorneys fees incurred.

The "Terms and Conditions of the Purchase Order Agreement" provide:

> **Indemnification**
>
> To the fullest extent permitted by law, the Supplier shall defend, indemnify and hold harmless the Owner and Contractor and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from performance of the Supplier's Work under this Purchase Order Agreement, but only to the extent caused in whole or in part by acts or omissions of the Supplier, the Supplier's Sub-suppliers, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder. ... ;

(Exhibit 7 to Attachment A, Affidavit of Lawrence P. Grant).

**A.    Applicable Kansas Law**

Indemnification provisions have been found by the Kansas courts to be valid and enforceable. *See Crane Construction Co. v. Klaus Masonry,* 71 F.Supp.2d 1125, 1134 (D.Kan.1999).

A court's initial inquiry focuses on whether the indemnification provision in the contract is ambiguous. *Dixon v. CertainTeed Corp.*, 944 F.Supp. 1501, 1505 (D.Kan. 1996). The contract is unambiguous if the intent of the parties can be ascertained by construing the document from its four corners. *Id.* "This inquiry involves a matter of law to be decided by the court." *Id.*

In *Dixon,* the court concluded that language similar to that found in the purchase order agreement was unambiguous. *Id.* at 1506.

### B.    Dearborn is Liable Under the Indemnification Clause of the Contract

Applying the language of the indemnification provision to the undisputed facts, Rand suffered "claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from performance of [Dearborn's] Work under [the] Purchase Order Agreement, " including $216,546.03 paid for labor, material and subcontract costs, $766,000.00 assessed as the result of the 10-day delay in providing a fully operational conveying system and attorneys fees.

The meaning and legal effect of written instruments are matters of law exclusively for the court and not questions of fact for determination by the jury. *Cline v. Southern Star Cent. Gas Pipeline, Inc.*, 356 F.Supp.2d 1203, 1216 (D.Kan. 2005). Dearborn is liable under the plain terms of the purchase order contract to indemnify Rand.

Because Rand has met its burden of demonstrating that under the terms of purchase order contract, Dearborn is required to indemnify Rand as a matter of law for "claims, damages, losses and expenses, including but not limited to attorney's fees," partial summary judgment should also be entered on Count III.

**Conclusion**

WHEREFORE, Plaintiff Rand Construction Company respectfully requests the Court enter partial summary judgment in its favor and against Dearborn, and for such other and further relief as the Court deems just and proper.

Respectfully submitted,

MANZ SWANSON & MULHERN, P.C.

*/s/ Theresa Shean Hall*

| | |
|---|---|
| Eric T. Swanson | KS Fed Bar 70407 |
| Theresa Shean Hall | KS Fed Bar 78079 |

1000 Walnut – Suite 800
Kansas City, Missouri 64106
Tel.:   (816) 472-5310
Fax:   (816) 472-5320
Email: eswanson@msmlawkc.com
          thall@msmlawkc.com
**ATTORNEYS FOR PLAINTIFF RAND
CONSTRUCTION COMPANY**

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of December, 2012, the above and foregoing document was electronically delivered to the following persons, along with a certificate of service, filed with the Court:

Thomas R. Buchanan
Linda C. McFee
McDowell, Rice, Smith & Buchanan
605 West 47th Street, Suite 350
Kansas City, Missouri 64112
tbuchanan@mcdowellrice.com
lmcfee@mcdowellrice.com
**ATTORNEYS FOR DEFENDANT**
**DEARBORN MID-WEST CONVEYOR CO.**

Mr. Owen Griffin
Moore & Brower, PC
4600 Madison, Suite 700
Kansas City, Missouri 64112
Business Phone: (816) 753-3030
Cellular Phone: (816) 456-7558
Facsimile:      (816) 753-3036
owengriffin@mhfpc.com

Mr. Robert W. Goff
Denton & Keuler
P.O. Box 929
Paducah, KY 42002-0929
Business Phone: (270) 443-8253
Cellular Phone: (270) 564-7570
Facsimile:      (270) 442-6000
rgoff@dklaw.com
**ATTORNEYS FOR THIRD-PARTY DEFENDANT**
**ARCH ENVIRONMENTAL EQUIPMENT , INC.**

*s/ Theresa Shean Hall*

_____
Theresa Shean Hall