IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| RAND CONSTRUCTION COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| DEARBORN MID-WEST CONVEYOR CO., | ) |
| | ) Case No.: 11-CV-2479-JTM-JPO |
| Defendant/Third Party Plaintiff, | ) |
| | ) |
| and | ) |
| | ) |
| ARCH ENVIRONMENTAL EQUIPMENT, INC. | ) |
| | ) |
| Third-Party Defendant. | ) |

## REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF RAND CONSTRUCTION COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the District Court of Kansas, Rand Construction Company ("Rand") submits the following reply memorandum in further support of its motion for partial summary judgment and in response to Defendant/Third-Party Plaintiff Dearborn Mid-West Conveyor Co.'s Opposition to Plaintiff Rand Construction Company's Motion for Partial Summary Judgment

### Introduction

In ruling on a request for summary judgment, the court ignores factual assertions that are immaterial, or not supported by affidavits and/or authenticated and admissible documents. *Stewart v. Board of Com'rs for Shawnee County, Kansas,* 216 F.Supp.2d 1265, 1269-1270 (D.Kan.2002). The court also disregards conclusory statements and statements that are conclusions of law rather than statements of fact. *Id.* Moreover, unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Phillips v. Calhoun,* 956 F.2d 949, 951

(10th Cir.1992). Therefore, even if uncontroverted by the opposing party, such assertions will be disregarded by the court and cannot support entry of summary judgment.

With regard to Dearborn's responses to Rand's "Statement of Uncontroverted Material Facts," Rand objects to Dearborn's responses to paragraphs 3, 4, 10, 12, 16, 17, 18, 19, 20, 23, 32, 33, 34, 35, 36, 37, 38, 39, 40, 42, 44, 45, 47, 48, and 49 as either failing to address the statement of fact asserted in such paragraph or addressing the statement but then adding unsupported, superfluous arguments, all contrary to the directives set forth in Rule 56.

### Rand's Reply to "Dearborn's Statement of Additional Material Facts"

1.     Admitted that on May 4, 2009, Rand issued a Request for Proposal for subcontract work on the Project, including the coal tripper, and that the Request for Proposal included *all* of the Air Force specifications and requirements for the Project. (Dearborn Ex. M, 5/4/09 Email from Rand to Dearborn containing project specifications)

2.     Admitted that on June 8, 2009, Dearborn submitted its proposal in response to Rand's Request for Proposal for subcontract work involving the coal conveying system at the Eielson Air Force Base. Deny that Dearborn's Ex. B is a copy of the complete Dearborn proposal. See "Table of Contents," page 2, of Ex. B.

3. Denied.   Dearborn's Ex. B cited in support of this statement is over 60 pages. Dearborn does not provide any reference to what pages in the lengthy exhibit where the proposal states that "Dearborn would provide certain specified equipment, including certain specific, manufacturer standard Arch V-plows and lift tables. It is the duty of the party contesting a motion for summary judgment to direct the court to the places in the record where evidence exists to support the non-movant's position. *See Caffree v. Lundahl,* 143 Fed. Appx. 102, 106 (10th Cir.2005). *See also SIL–FLO, Inc. v. SFHC, Inc.,* 917 F.2d 1507, 1513–14 (10th Cir.1990)

(the court will not sift through the record to find support for an argument). A party asserting that a fact cannot be disputed must support such assertion with a citation to the particular part of the materials in the record. Rule 56 of the Federal Rules of Civil Procedure. Furthermore, the statement is disputed in that it is misleading and taken out of context of the entire Proposal

4.      Admitted that the Proposal included Appendix F. Denied as to the statement that Appendix F contains "clarifications and exceptions to certain terms in Rand's RFP." Appendix F and Appendix A both state that Dearborn is directing its "clarifications and exceptions" to the Solicitation No. FA-5004-09-R-C007 specifications. The Court will disregard conclusory statements and statements that are conclusions of law rather than statements of fact. *Stewart v. Board of Comers for Shawnee County, Kansas,* 216 F.Supp.2d 1265, 1269-1270 (D.Kan. 2002).

5.      Admitted.

6.      Denied.  The Court will disregard conclusory statements and statements that are conclusions of law rather than statements of fact. *Stewart v. Board of Comers for Shawnee County, Kansas,* 216 F.Supp.2d 1265, 1269-1270 (D.Kan. 2002). In further response, Rand states that Dearborn's Ex. E confirms that the agreement to exclude liquidated damages from Dearborn's contract applied solely to delays in transporting the system to the Project site.

7.      Denied.   Dearborn misstates the Air Force's requirements and specifications. Section 1.03 in fact states: "The conveyor system shall be the Contractor's standard design for the service specified."

8.      Admitted.

9.      Denied. Interpretation of a contract is a question of law for determination by the court. *See United States Fidelity & Guaranty Co. v. Dealers Leasing, Inc.,* 137 F.Supp. 2d 1257, 1259 (D.Kan. 2001). Furthermore, the court will disregard conclusory statements and

statements that are conclusion of law rather than statements of fact. *Stewart v. Board of Comers for Shawnee County, Kansas,* 216 F.Supp.2d 1265, 1269-1270 (D.Kan. 2002).

10.    Denied. Interpretation of a contract is a question of law for determination by the court. *See United States Fidelity & Guaranty Co. v. Dealers Leasing, Inc.,* 137 F.Supp. 2d 1257, 1259 (D.Kan. 2001). Furthermore, the court will disregard conclusory statements and statements that are conclusion of law rather than statements of fact. *Stewart v. Board of Comers for Shawnee County, Kansas,* 216 F.Supp.2d 1265, 1269-1270 (D.Kan. 2002 ).

11.    Admitted that on or about October 7, 2009, Rand entered into a purchase order contract with Dearborn "for the design, fabrication, and delivery of the Material Handling System for the Eielson AFB." Deny that the purchase order contract expressly incorporated Dearborn's proposal including the provisions regarding liquidated damages and warranty work. dions regarding liqutr roposa, and that Appendix F was included in the DMW Proposal. Denied as to other statements.  the court will disregard conclusory statements and statements that are conclusion of law rather than statements of fact. *Stewart v. Board of Comers for Shawnee County, Kansas,* 216 F.Supp.2d 1265, 1269-1270 (D.Kan. 2002 ).

12.    Admitted that Larry Grant, the project manager for Rand on the Project, participated in negotiating the contract with Dearborn.  Denied as to the statement that that "Dearborn's proposal expressly disclaimed liquidated damages."  ." The court will disregard conclusory statements that are conclusions of law rather than statements of fact. *Stewart v. Board of Comers for Shawnee County, Kansas,* 216 F.Supp.2d 1265, 1269-1270 (D.Kan. 2002).

13.    Admitted that the purchase order contact contained the "Indemnification Clause" Denied that such clause was "boilerplate." The court will disregard conclusory statements that

are conclusions of law rather than statements of fact. *Stewart v. Board of Comers for Shawnee County, Kansas,* 216 F.Supp.2d 1265, 1269-1270 (D.Kan. 2002 ).

14. Admitted that the proposal and purchase order were included in the contract between Rand and Dearborn. Denied as to other statements. The court will disregard conclusory statements that are conclusions of law rather than statements of fact. *Stewart v. Board of Comers for Shawnee County, Kansas,* 216 F.Supp.2d 1265, 1269-1270 (D.Kan. 2002Admitted.

15. Admitted.

16. Denied. Cite to "Harp depo." does not support statement as required by Rule 56 of the Federal Rules of Civil Procedure.

17. Denied. Cite to "Grant depo." not support statement as required by Rule 56 of the Federal Rules of Civil Procedure.

18. Denied. Cite to "Grant depo." not support statement as required by Rule 56 of the Federal Rules of Civil Procedure.

19. Denied. Interpretation of the Prime Contract is a question of law for determination by the court. *See United States Fidelity & Guaranty Co. v. Dealers Leasing, Inc.,* 137 F.Supp. 2d 1257, 1259 (D.Kan. 2001). Furthermore, the court will disregard conclusory statements and statements that are conclusion of law rather than statements of fact. *Stewart v. Board of Comers for Shawnee County, Kansas,* 216 F.Supp.2d 1265, 1269-1270 (D.Kan. 2002 ).

20. Denied. Multiple and thorough studies of "Exhibit A to Rand-Three Phase Contract, Ex. L" failed to locate any reference to "belt cleaning equipment" or a "tail pulley" much less Rand being responsible for "installation or adjustment … of belt cleaning equipment to protect the tail pulley from debris that might cause misalignment or belt stoppage." .

21.   Admitted that on or about June 26, 2010, Rand attempted to start and run the new conveyor system supplied by Dearborn and that such system failed to perform in that coal "back-up" and spillage problems occurred. Rand further states that Dearborn's reference to "manufacturer's standard Design V-plows" is not supported its citations to the record as required by Rule 56 of the Federal Rules of Civil Procedure and must be disregarded.

22.   Denied. ""Grant depo. 11:7-18:9; 20:17-25, Ex A "does not support statement as required by Rule 56 of the Federal Rules of Civil Procedure.

23.   Denied. "Grant depo. 74:20-75:3, Ex. A" does not support statement as required by Rule 56 of the Federal Rules of Civil Procedure. Mr. Grant in fact testified as to "several tons" not "20 tons" of coal.

24.   Denied. "Grant depo. 62:19-22, Ex. A" does not support statement as required by Rule 56 of the Federal Rules of Civil Procedure. Mr. Grant in fact testified as to "several tons" not "20 tons" of coal. Moreover, according to Dearborn's own employee, after starting the conveyor system for the first time, when the *first* of six bunkers was *only 4% full*, approximately *400 lbs.* of coal had already been spilled on the ground. Dearborn Exhibit F, p. p6 of 15.

25.   On June 26, 2010, Mr. Grant advised Dearborn that the spillage of coal was too great. Denied as to other statements. "Grant depo., p. 85:8-13, Ex. A" does not support Rand's statement as required by Rule 56 of the Federal Rules of Civil Procedure. In fact, Mr. Grant states that on that date, the contracting officer for the U.S. Government advised him verbally that the coal spillage was too great. According to Mr. Grant, the government contracting officer told him that the "spillage is too great" and that the system was "unacceptable, we've got to remedy it." (Larry Grant deposition, p.85:8-25., 86:1, Ex. A).

6

26.   Denied. Citations do not support statements as required by Rule 56 of the Federal Rules of Civil Procedure.

27.   Denied. "7/9/10 Email, attached hereto as Ex. S" and "Saha deposition, 97:22-23, Ex. Q" does not support statement as required by Rule 56 of the Federal Rules of Civil Procedure.

28.   Admitted that on or about July 7, 2011, the new conveying system was operational and was accepted by the Air Force. Denied as to statement that "specially designed conveying system" because it is not supported by "Larry Grant deposition, 313:19-21, Ex. A; 7/9/10 email, Ex. S."

29.   Admitted that "Amendment of Solicitation/Modification of Contract to Three Phase" dated August 5, 2010, referencing Project MaFTPW 07-1024 was issued by the government.   Denied as to the remainder of the statement.   Interpretation of a contract is a question of law for determination by the court. *See United States Fidelity & Guaranty Co. v. Dealers Leasing, Inc.,* 137 F.Supp. 2d 1257, 1259 (D.Kan. 2001). Furthermore, the court will disregard conclusory statements and statements that are conclusion of law rather than statements of fact. *Stewart v. Board of Comers for Shawnee County, Kansas,* 216 F.Supp.2d 1265, 1269-1270 (D.Kan. 2002 ).

30.   Admitted that statement an accurate quotation form the Amendment but denied as not relevant to issues before the Court. Interpretation of a contract is a question of law for determination by the court. *See United States Fidelity & Guaranty Co. v. Dealers Leasing, Inc.,* 137 F.Supp. 2d 1257, 1259 (D.Kan. 2001). Furthermore, the court will disregard conclusory statements and statements that are conclusion of law rather than statements of fact. *Stewart v. Board of Comers for Shawnee County, Kansas,* 216 F.Supp.2d 1265, 1269-1270 (D.Kan. 2002 ).

31.  Admitted.

**32.**  Admitted.

**Arguments and Authorities**

**I.  Summary Judgment Standard**

The goal of "the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in the movant's favor when the movant has "show[n] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." An issue is "genuine" if sufficient evidence exists on each side "so that a rational trier of fact could resolve the issue either way" and "[a]n issue is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir.1998) (citations omitted).

Once the moving party meets its burden of proof on a claim or defense raised in a summary judgment motion, the burden shifts to the non-moving party to identify specific facts that show the existence of a genuine issue of material fact. *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991). In setting forward these specific facts, the non-movant must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler,* 144 F.3d at 671.

The nonmoving party cannot defeat a properly supported motion for summary judgment by relying on conclusory allegations; rather, the opposing party must come forward with significant admissible probative evidence supporting that party's allegations. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). The mere

existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.*

Finally, it bears repeating that summary judgment is not a "disfavored procedural shortcut." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986). It is an important procedural vehicle "designed to secure the just, speedy and inexpensive determination of every action." *Id.*

Against the backdrop of these well-established standards, the Court's attention is directed to Rand's additional arguments and authorities submitted in response to Dearborn's position that Rand's request for partial summary judgment must be denied.

**II.  Because Rand has met its burden of demonstrating the absence of a genuine issue of material fact as to the five elements of its cause of action for breach of contract and entitlement to judgment as a matter of law, partial summary judgment should be entered in Rand's favor on Count I of its Complaint.**

Rand seeks partial summary judgment as to Dearborn's liability on Rand's breach of contract claim. Specifically, Rand seeks an order determining as a matter of law that Dearborn breached the parties' contract by failing to design and supply a conveyor system that "would transport coal as required by the performance requirements set forth in Solicitation No. FA-5004-09-R-C007, and the drawings and specifications and the prime contract."[1]

Kansas law provides that a party bringing a breach of contract claim has the burden to show: (1) the existence of a contract between the parties; (2) consideration; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) defendant's breach of the contract; and (5) damages to plaintiff caused by the breach. *See Cline v. Southern Star Cent. Gas Pipeline, Inc.,* 356 F.Supp.2d 1203, 1216 (D.Kan. 2005).

---

[1]The Court's attention is directed to the fact that the parties have come to refer to "Solicitation No.FA-5004-09-R-C007, and the drawings and specifications and the prime contract" collectively as "Solicitation No. FA-5004-09-R-C007 specifications" or simply the "Air Force's specifications."

There is no question in this case that the contract exists and neither party asserts that their agreement is void due to lack of consideration. As to the third element, Rand's showing of performance or its willingness to perform in compliance with the contract has not been challenged by Dearborn and, therefore, is uncontroverted. And, with regard to the fifth element, although Dearborn contends that Rand cannot recover its damages from Dearborn, the fact that Rand incurred expenses and/or paid significant sums as the result of the failure of the new conveyor equipment to transport coal is undisputed. In fact, it its response to Rand's arguments and authorities, Dearborn disputes only the "breach" element of Rand's cause of action.

Therefore, the issues before the Court boil down to whether in response to Rand's prima facie showing of a right to partial summary judgment, Dearborn has "come forward with significant admissible probative evidence supporting [its] allegations" that "Rand received exactly what it contracted for and Dearborn did not breach the parties' contract."

A breach of contract is "a material failure of performance of a duty arising under or imposed by agreement." *Daggett v. Board of Public Utilities of Unified Government of Wyandotte County/Kansas City*, 46 Kan.App.2d 513, 515, 263 P.3d 847, 849 (2011). Where there are no disputed material facts, the determination of whether a party breached the contract is a question of law and is appropriate for summary judgment. *Id.*

Accordingly, the focus shifts to whether the uncontroverted material facts demonstrate that Dearborn failed to perform its duties arising under the agreement with Rand to design, fabricate and supply a conveyor system for installation inside the power plant on the Eielson AFB that could handle a certain volume of coal and transport the material at a particular speed.

A. **Undisputed Material Facts Establish that Dearborn Breached the Contract.**

1. **Uncontroverted facts.**

10

### *Stipulated Facts*

The Pre-Trial Order sets forth the following facts stipulated to by the parties:

On or about April 28, 2009, the Department of Air Force (the "Air Force") issued Solicitation No. FA 5004-09-R-C007, seeking bids for the coal-delivery system project at issue in this case. The Air Force, as owner, after consideration of the bids received, ultimately awarded the prime (or general) contract on the project to Three Phase Electric, Inc. ("Three Phase"). Rand entered into a contract with Three Phase for Rand to perform mechanical work on the project. Rand in turn entered into a subcontract with Dearborn with regard to coal-conveying equipment. And Dearborn in turn entered into another contract under which Arch supplied the V-plows and lift tables that were part of the conveying system.

(Doc. 46, p. 3).

### *Rand-Dearborn Contract*

On May 4, 2009, Rand issued a Request for Proposal for project FTQW 07-1024 accompanied by the specifications and requirements included in Solicitation No. FA 5004-09-R-C007 for such project. SOF 1.[2]

Section M-002 of the Solicitation No. FA 5004-09-R-C007 specifications titled "V-Plow Conveyor" is cited by both parties in support of their respective motions for partial summary judgment. SOF 7.  Section M-002 is attached to Doc. 53, Memorandum in Support of Rand's Motion for Partial Summary Judgment ("Rand's Memorandum"), as "Doc.53-3; Exhibit A - 2."

"PART 1 GENERAL" of Section M-002 states in paragraph 1.10 that the specification is for "furnishing one (1) complete V-Plow Conveyor System … for the Eielson AFB Central Heat and Power Plant in Alaska." Doc.53-3; Exhibit A – 2 to Doc. 53 "Rand's Memorandum," page M-002-1. Section M-002 further states in paragraph 1.02 that the "purpose for this new V-Plow Conveyor system is … to automate the coal unloading operations." *Id.*

---

[2] Unless otherwise indicated, "SOF" refers to "Dearborn's Statement of Additional Facts" set forth in Doc. 65, "[Dearborn's] Opposition to Plaintiff Rand Construction Company's Motion for Partial Summary Judgment" ("Dearborn's Opposition").

"PART 2 ITEMS SUPPLIED" of Section M-002 requires the furnishing of "a complete V-Plow Conveyor System that shall unload coal into six (6) coal bunkers" and that "[t]he V-Plow Conveyor System shall be installed to convey lignite coal at a rate of 150 tons per hour." Doc.53-3; Exhibit A – 2, page M-002-2.

In addition, "PART 4 DESIGN CRITERIA" of Section M-002 provides:

4.01    The following design criteria applies:

      A.    The V-Plow Conveyor System is to be design(sic) at a capacity of 150 TPH [tons per hour]. ...

      B.    Usibelli Mine sub-bituminous coal @ 50 pounds per cubic foot is to be conveyed.

* * *

      I.    The Owner will operate the coal handling systems twice daily; however, all components shall be designed for continuous, severe, heavy duty, minimum maintenance, 24 hours per day, 365 days per year operation in a coal –fired power plant environment.

        a.    The conveyor system shall be designed to minimize spillage. ...

Doc.53-3; Exhibit A – 2, pages M-002-4 - M-002-5.

Section M-002 of the specifications in "PART 7 PERFORMANCE GUARANTEE" further provides that V-Plow Conveyor System shall:

- "perform at the Design Capacity required to operate all production equipment connected at full design speeds as specified on the concept/design drawings and/or description of operation;"

- "be designed and fabricated to transport coal through the system without jams, pressure, or damage;" and

- "function in such a manner to provide a continuous flow to the downstream equipment."

Doc.53-3; Exhibit A – 2, page M-002-13.

Dearborn responded on June 8, 2009, to Rand's request for a proposal ("RFP") by submitting to Rand "DMW Proposal No. B-41267-A1 May 2009" for "Eielson AFB-Rand

12

Construction Automate Coal Bunker OPS, CH&PP Alaska, Specification # FTQW 07-1024."

SOF 3; Doc. 53-5, Exhibit A-4 to Doc. 53 "Rand's Memorandum." The DMW Proposal includes

Appendix A though Appendix L. Doc. 53-5, Exhibit A-4, "Table of Contents," p. 2. The

Solicitation No. FA-5004-09-R-C007 specifications are specifically referenced throughout the

proposal.

The "Appendix A Cover Letter" section of the DMW Proposal provided to Rand, which

was prepared by Sudy L. Vohra, Executive Vice-President and General Manager of Dearborn,

states in pertinent part:

> We are pleased to submit our proposal, one (1) original, one (1) copy and one (1)
> electronic copy for the design, fabrication, and delivery of the Material Handling
> System for the above referenced project.
>
> Our offer is generally in compliance with the specifications issued with the
> request for proposal dated May 9, 2009 and amendments 1, 2 and 3. Our
> clarifications and exceptions are listed in Appendix F to our proposal. Upper most
> in our minds, however, are two concerns namely:
>
>> 1. To offer you the most cost effective proposal.
>>
>> 2. To offer equipment that is commercially available with proven
>>    performance.
>
> With the above concerns in mind and having considerable experience in bulk
> materials handling systems, we have used our judgment to offer you equipment
> that is industry standard for power plants. ...
>
> We have an experienced project team available and are prepared to accept this
> contract and execute our obligations to your satisfaction. ...

Doc. 53-6, Exhibit A-5 to Doc. 53 "Rand's Memorandum."

The "Appendix F Bid Exceptions and Clarifications" section referenced above in

"Appendix A," states as follows:

> We have reviewed your standard terms and conditions under Sections B, F, G, H
> and I of Specification No. FA5004-09-R-C007 and find them generally to be
> acceptable. However, there are certain clauses that need to be discussed at the

13

time of the award to understand the intent. The following covers our clarification to some of the clauses: ...

Doc. 53-7, Exhibit A-6 to Doc. 53 "Rand's Memorandum."

In "Appendix F," Dearborn specifically mentions "Section M-002" and "Section M-003" of Specification No. FA5004-09-R-C007. Doc. 53-7, Exhibit A-6.

In addition, the "Appendix C Intent and Scope of Supply" section of Dearborn's proposal sets forth detailed descriptions/specifications applicable to the design and of the "Coal Handling System," including the following:

> DMW will furnish the design, manufacture and supply of the following Coal Handling System:

> A. BASE-36" BELT CONVEYOR

> 1. One (1) lot of discharge chutework at Primary Bucket Elevator.

> 2. One (1) Dust Suppression System for the Primary Bucket Elevator and Auxiliary Bucket Elevator. Each elevator will have dust suppression in the inlet and discharge chutes, with the system being utilized on one elevator at a time.

> 3. One (1) 36" wide Coal Unloading Plow Conveyor rated 150 TPH at 175 FPM, 136.25 ft. horizontal centers with no lift. It will be complete with 10 HP motor, speed reducer, high speed and low speed couplings, pulley outfits, belting, idlers, belt scrapers, v-plow, guards, safety devices, and screw take-up. The conveyor frame work will consist of fabricated steel channel stringers with support legs and discharge chute to Bunker 6.

> 4. Five (5) pneumatic operated V-Plows mounted on Coal Unloading Plow Conveyor. One plow each for Bunker 1 through 5.

> 5. Six (6) 2500 CFM Bin Vents, one on each Bunker 1 through 6.

Doc. 53-5, Exhibit A-4 to Doc. 53 "Rand's Memorandum," p. 16 of 61.

Thus, in Appendix C of its proposal Dearborn incorporated certain performance requirements found in Section M-002 of the Solicitation No. FA 5004-09-R-C007 specifications for project, including but not limited to providing a V-plow conveyor system consisting of six bunkers and five V-plows operating at a rate of 150 TPH (tons per hour).

Dearborn's "Appendix C Intent and Scope of Supply" section of its proposal to Rand further provides:

> BELT CONVEYOR – DESIGN INFORMATION
>
> We have designed equipment in accordance with the Conveyor Equipment Manufacturers Association's standards for continuous operation and all the components will be commercially available and manufactured according to good engineering practices and industry standards.
>
> Dearborn Mid-West Conveyor has taken into consideration the importance of system equipment availability while conforming to the guidelines set forth in the specifications and maintaining the most cost effective bid proposal.
>
> \* \* \*
>
> LIST OF MAJOR CONVEYOR EQUIPMENT
>
> Dearborn Mid-West Conveyor will furnish design, supply, and delivery of the equipment with details of the various components as follows:
>
> \* \* \*
>
> D. BELT CLEANERS & RETURN BELT PLOWS
>
> Heavy duty belt cleaners will be provided at the head end of each conveyor. V-plows will be provided to clean the return side of the belt on each conveyor. Belt cleaning devices will be in accordance to specifications.

Doc. 53-5, Exhibit A-4 to Doc. 53 "Rand's Memorandum," pp 20 and 21 of 61.

On or about October 7, 2009, Rand entered into the purchase order contract, which incorporated "DMW Proposal No. B-41267-A1 May 2009," agreeing to pay Dearborn $1.1 million to "Design & Supply Plow Conveyor System." SOF 11; Doc. 53-8, Exhibit A-7 to Doc. 53 "Rand's Memorandum."

### *Installation and subsequent failure of the conveyor system to operate.*

On June 26, 2010, when Rand started the new conveyor system supplied by Dearborn to move coal, the conveyor equipment failed to operate and shut-down because the coal "backed-

up" and/or spilled off the conveyor. SOF 23. In the following paragraphs, *Dearborn's own employees* describe the events surrounding failure of the system and the cause of the failure.

On Sunday, June 27, 2010, Lloyd Sanders, Dearborn's Project Manager, sent an email to Arch Environmental stating, "We cannot run with the coal trapped as the table jams up with coal." Doc. 65-6, Exhibit F to Doc. 65 "Dearborn's Opposition," p. 2 of 15. At 1:45 a.m. on Sunday, June 27, 2010, Mr. Sanders also emailed Dearborn personnel stating:

> I need your assistance this Sunday 6/27 to look at possible ways the field can modify the plow at Eielson AFB. The plow is trapping coal during the lowering cycle and will not go back into the up position because the coal is trapped between the lift table and the fixed chute. (see attached sketch). This is very critical as LDs will be assessed for each day starting Sunday that this is not fixed. I have left a message with Arch (plow vendor) and will continue to contact them until they are engaged.

Doc. 65-6, Exhibit F to Doc. 65 "Dearborn's Opposition," pp. 4-5 of 15.

In his email dated June 28, 2010, Robert Shelton, Dearborn's liaison and field representative for the Project, described the problems that occurred when the conveyor was run for the first time as follows:

> 4-On Saturday, around 3:00 PM. We run the coal for the first time

> A - By the time we filled the First bunker 4%, we spilled approximately 400 lbs of coal on the floor under the plow.

> 1) Cause of spill:

> > a) Plow sits too far forward on table causing material to fall off belt forward of table on both sides.

> > b) Material flowed between the primary plow and the small secondary plow back on the belt

> > c) When the table was lowered coal falls off back on the table between the table and belt. This prevents the table from lifting to the full up position the next time.

Doc. 53-15, Exhibit G to Doc. 53 "Rand's Memorandum."

On Tuesday, June 29, 2010, Mr. Sanders in an email to both Dearborn and Arch personnel with the notation "Subject: Eielson- Plow Issue," states:

> We have moved the plow back one foot and attached the chute directly to the table per Arch's recommendation. See attached. This has not worked. We still have product building up on the sides of the table and causing a pooling effect ahead of the plow. The Eielson AFB wants us to address this immediately and wants a (sic) Arch representative on site.

Doc. 53-17, Exhibit I to Doc. 53 "Rand's Memorandum," p.1.

According to Mr. Shelton, "[the conveyor system's] performance was not acceptable." Doc. 53-15, Exhibit F to Doc. 53 "Rand's Memorandum," Deposition of Robert Shelton, page 98, lines 3-11. Mr. Shelton further testified that there "was no problem with the installation" of the "new v Plow and lift tables delivered by Arch" and installed by Rand and that "[Rand] did a very good job." Doc. 53-15, Exhibit F, Deposition of Robert Shelton, page 123, lines 20-25, page 124, lines 1-3.

In a letter dated July 15, 2010, to Rick Archer at Arch Environmental Equipment referencing "Subject: Improper functioning of V-plows for filling of Bins," Mr. Sanders states:

> The equipment originally supplied by Arch Environmental for the above referenced project did not function as specified in our purchase order at the end of the original shutdown. Dearborn Midwest Conveyor (DMW) has incurred considerable additional costs and charges while modifying and field retrofitting this equipment to meet the specifications in the shortest time possible. As the design of the lift tables, associated plows and conveyor to meet the specifications was the responsibility of Arch Environmental, DMW will look to Arch Environmental to reimburse DMW for all the additional costs and charges incurred while the equipment was modified to work as specified.

Doc. 53-19, Exhibit K to Doc. 53 "Rand's Memorandum."

### 2.     The undisputed material facts establish that Dearborn breached the contract.

Where there are no disputed material facts, the determination of whether a party breached the contract is a question of law and is appropriate for summary judgment. " *Daggett v. Board of*

*Public Utilities of Unified Government of Wyandotte County/Kansas City*, 46 Kan.App.2d 513, 515, 263 P.3d 847, 849 (2011).

Without question, the proposal became part of the $1.1 million purchase order. And, contrary to Dearborn's newly-minted contention that "the Air Force Specifications were not part of the parties' contract,"[3] as specifically mentioned in the proposal Dearborn agreed to design, fabricate and supply a conveyor system to Rand that would transport coal according to the performance requirements set forth in the Solicitation No. FA-5004-09-R-C007 specifications.

Even the most cursory review of the DMW proposal reveals hundreds of pages setting forth various descriptions/specifications applicable to the conveyor system and equipment to be designed and supplied by Dearborn, some of which mirror the performance requirements found in the Air Force's specifications. Quoting one such paragraph from its proposal, Dearborn agreed to supply:

> One (1) 36" wide Coal Unloading Plow Conveyor rated 150 TPH at 175 FPM, 136.25 ft. horizontal centers with no lift. It will be complete with 10 HP motor, speed reducer, high speed and low speed couplings, pulley outfits, belting, idlers, belt scrapers, v-plow, guards, safety devices, and screw take-up. The conveyor frame work will consist of fabricated steel channel stringers with support legs and discharge chute to Bunker 6.

Another example of Dearborn's obligations under the contract to design and supply a conveyor system that would meet the performance requirements for transporting coal:

LIST OF MAJOR CONVEYOR EQUIPMENT

Dearborn Mid-West Conveyor will furnish design, supply, and delivery of the equipment with details of the various components as follows:

---

[3] In its dispositive motion (Doc. 50), Dearborn took the opposite position contending that it is entitled to summary judgment because it complied with the contract requirements set forth in the Air Force's specifications by supplying "standard" V-plows and lift tables. Dearborn's Motion, Doc. 50, pp. 11-12. However, several references to the "V-plow design meeting the Air Force specifications" were neatly carved out of Dearborn's arguments before they were repeated in opposition to Rand's motion.

BELT CLEANERS & RETURN BELT PLOWS

> Heavy duty belt cleaners will be provided at the head end of each conveyor.
> V-plows will be provided to clean the return side of the belt on each conveyor.
> Belt cleaning devices will be in accordance to specifications.

Furthermore, according to Dearborn's own employee on site, after starting the conveyor system for the first time, when the first of six bunkers was only 4% full, approximately *400 lbs.* of coal had already been spilled on the ground. Moreover, Dearborn's employees confirmed that the conveyor system would not transport coal and instead shut-down because the plow trapped the spilled coal during the lowering cycle between the lift table and the fixed chute thereby preventing the table from lifting back up and returning to the full up position.

"In the end, when confronted with a fully briefed motion for summary judgment, the court must determine 'whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Crane Construction Co. v. Klaus Masonry*, 71 F.Supp.2d 1125, 1128 (D.Kan.1999) quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Pinkerton v. Colorado Dept. of Transp.*, 563 F.3d 1052, 1058 (10th Cir. 2009).

Taking the record as a whole in this case "could not lead a rational trier of fact" to find in favor of Dearborn. Therefore, partial summary judgment should be entered in favor of Rand.

**B.    Dearborn's bald assertions that Rand and the Air Force changed the contract requirements after the agreed-upon equipment was installed does not show the existence of a genuine issue of material fact or otherwise defeat Rand's properly supported motion for partial summary judgment.**

In last-ditch effort to avoid summary judgment, Dearborn contends that it timely supplied the "manufacturer's standard v-plows and lift tables," which Rand agreed to purchase. Dearborn

further contends that after the agreed-upon conveying equipment was installed and running, with only a "nominal" amount coal spillage, Rand and the Air Force decided that they wanted a different product – a custom-designed v-plow system.

Stretching credulity to a breaking point, Dearborn then attributes the cause of the shutdown and subsequent work on the coal conveying system to Rand and the Air Force deciding to "scrap Arch's manufacturers'- standard design V-Plow system and replace it with a custom V-Plow system with completely different features, characteristics and capabilities." Not surprisingly, there is no support in the record for Dearborn's version of the facts in this case.

For example, Dearborn cites to "SOF 3, SOF 7 and SOF 11" as the sole support for its assertions that (1) the Air Force's specifications[4] for the conveying system required the contractors to use manufacturers' standard design v-plows and lift tables; (2) Dearborn's proposal included manufacturers' standard design v-plows and lift tables; and (3) that Rand agreed to purchase from Dearborn manufacturers' standard design v-plows and lift tables.

Dearborn's reference to the record that allegedly supports SOF 3 consists of the entire 62 page DMW proposal. It is the duty of the party contesting a motion for summary judgment to direct the court to the places in the record where evidence exists to support her position. *See Caffree v. Lundahl,* 143 Fed. Appx. 102, 106 (10th Cir.2005). *See also SIL–FLO, Inc. v. SFHC, Inc.,* 917 F.2d 1507, 1513–14 (10th Cir.1990) (the court will not sift through the record to find support for an argument).

---

[4] Dearborn's emphatic assertion that "the Air Force's specifications were not part of the parties' contract" completely undermines its argument that it fulfilled its obligations under the $1.1 million contract with Rand by providing manufacturers' standard design v-plows and lift tables. The Air Force's specifications is the only support cited by Dearborn for its position that it complied with the Dearborn-Rand contract.

As to SOF 7 and SOF 11, Dearborn's citations to the record do not support the assertion of uncontroverted material facts that the Air Force's specifications for the conveying system required the contractors to use manufacturers' standard design v-plows and lift tables; Dearborn's proposal included manufacturers' standard design v-plows and lift tables; or that Rand agreed to purchase from Dearborn manufacturers' standard design v-plows and lift tables.

Likewise, "Rand's SOF 25 and SOF 26" do not support Dearborn's claim that it is "uncontroverted" that Dearborn timely supplied to Rand Arch's standard v-plows and lift tables as expressly stated in the parties' contract. Furthermore, SOF 16 and SOF 17 are conclusory, self-serving statements of both fact and law and are unsupported by the record. The nonmoving party cannot defeat a properly supported motion for summary judgment by relying on conclusory allegations; rather, the opposing party must come forward with significant admissible probative evidence supporting that party's allegations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).

Finally, the record in this case as well as the express terms of the parties' contract squarely refute Dearborn's claim that after the standard v-plows and lift tables were installed Rand and/or the Air Force decided that they wanted a "very different conveying system."

A party opposing summary judgment "cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith,* 853 F.2d 789, 793 (10th Cir.1988).

As noted at the outset of this point, the determination of whether a party breached the contract is a question of law and is appropriate for summary judgment where there are no disputed material facts. *See Daggett v. Board of Public Utilities of Unified Government of Wyandotte County/Kansas City*, 46 Kan.App.2d 513, 515, 263 P.3d 847, 849 (2011).

21

The uncontroverted material facts demonstrate that Dearborn failed to perform its duties arising under the agreement with Rand to design, fabricate and supply a conveyor system that when installed in the Eielson AFB power plant and operating, it would meet the performance specifications required to transport coal within the plant. Rand met its burden of making a prima facie showing of the absence of a genuine issue of material fact as to the elements of its cause of action for breach of contract and it right to judgment as a matter of law.

Dearborn has not – and, for that matter, cannot – come forward with admissible probative evidence in support of its allegations. Entry of partial summary judgment in favor of Rand on Count I of its Complaint accomplishes the purpose of summary judgment – disposal of Dearborn's factually unsupported claims and defenses.

Applying Kansas law to the undisputed facts, Rand has shown the absence of a genuine issue of material fact as to all the elements of its cause of action for breach of contract and entitlement to judgment as a matter of law. Accordingly, partial summary judgment should be entered in Rand's favor on Count I.

### III.   The "Warranty Provision" does not apply to limit Rand's recovery from Dearborn as a matter of law.

Dearborn argues that Rand's remedy for Dearborn's failure to design and supply a conveying system that would meet the performance requirements as set forth in the drawings and specifications included in Solicitation No. FA 5004-09-R-C007 is limited by the parties' contract. According to Dearborn, the following "warranty provision" limits Rand's remedies for Dearborn's breach:

**Warranties**

DMW will provide replacement goods for defective equipment but removal and installation would be by others.

22

Dearborn further argues that by virtue of this provision, the parties "further agreed that Dearborn would not bear any costs associated with the removal and installation of those replacement goods." Dearborn invites the Court to disregard other provisions in the contract as well as the nature of the damages sought by Rand and rule that since "costs associated with removing old equipment or installing new equipment ... is precisely the damages Rand now seeks to recover in this case[,] Rand is barred from recovering these damages and Dearborn is entitled to judgment as a matter of law."

As discussed in the paragraphs that follow, Dearborn's arguments regarding the damages recoverable from Dearborn fail on three fronts.

First, Dearborn has not shown that Rand is seeking damages for delivery of nonconforming goods or the cost of installation and/or replacement of equipment. At the very least, the precise damages sought by Rand and the amount recoverable are questions of material fact to be determined at trial.

Second, Dearborn's reading of the "Warranties" clause is contrary to and more expansive than the actual wording chosen by Dearborn. According to its plain meaning, the clause applies to a defective part and not to the failure of the entire V-Plow Conveyor System. Reasonable interpretations, rather than unreasonable ones, are favored by the law. *First Nat'l Bank of Olathe v. Clark,* 226 Kan. 619, 624, 602 P.2d 1299, 1303 (1979). Interpretations which vitiate the contract's purpose or reduce its terms to an absurdity should be avoided. *Id.*

Moreover, as the drafter of the clause at issue, any uncertainty as to its meaning will be construed against Dearborn. *See Daggett v. Board of Public Utilities of Unified Government of Wyandotte County/Kansas City,* 46 Kan.App.2d 513, 515-520, 263 P.3d 847, 851-852 (2011) (The purpose for the rule "is to protect the party who did not choose the language from an

23

unintended or unfair result.") Giving Dearborn the benefit of its own interpretation of a provision it drafted to limit Rand's recovery arising from Dearborn's breach would certainly subject Rand to an unfair result.

In addition, Dearborn's authorities are distinguishable. Unlike the provisions at issue in the cases cited by Dearborn, *Standard Bank, PLC v. Runge, Inc.* 443 Fed.Appx. 347 (10th Cir. 2011) and *Audiotext Communications Network, Inc. v. US Telecom, Inc.*, 912 F.Supp. 469 (D.Kan.1995), the "Warranties" clause does not expressly limit Dearborn's liability.

Furthermore, Dearborn's reliance on the excerpt from Mr. Grant's deposition testimony lends no support to its position given that interpretation of a contract is a question of law for the court. *See Peoples Mortg. Corp. v. Kansas Bankers Sur. Trust Co.*, 176 F.Supp.2d 1199, 1204 (D.Kan. 2001). However, Rand submits that Mr. Grant's testimony in fact confirms that the parties understood that the provision applied to "replacement parts" only.

Third, Dearborn's position is inconsistent with other provisions included in the DMW Proposal submitted to Rand setting forth express warranties regarding performance of conveyor system as required by the Air Force's specifications. According to a case relied upon by Dearborn to support its arguments, *Ray Martin Painting, Inc. v. Ameron, Inc.*, 638 F.Supp.768 (D.Kan. 1986), an express warranty may be based upon a statement or representation made by the seller. *Id.* at 772.

Quoting *Naaf v. Griffitts*, 201 Kan. 64, 439 P.2d 83 (1968), the court in *Corral v. Rollins Protective Services, Inc.*, 240 Kan. 678, 732 P.2d 1260 (1987), held that "[a]n express warranty is created by any direct and positive affirmation of fact made by the seller concerning the article to be sold during sale negotiations and as part of the contract upon which the seller intends the buyer to rely in making the purchase." 240 Kan. 678, 685, 732 P.2d 1260, 1266. The court in

*Corral* further ruled that whether or not the transaction is governed by the UCC does not preclude the application of common-law warranties to transactions not controlled by the UCC. 240 Kan. 678, 684, 732 P.2d 1260, 1265.

Returning once again to the DMW Proposal, a number of statements and representations were made by Dearborn that were clearly intended to induce Rand to contract with Dearborn for "the design, fabrication, and delivery of the Material Handling System for [project FTQW 07-1024]." For example, "Appendix A – Cover Letter" to the DWM Proposal states:

Upper most in our minds, however, are two concerns namely:

> 3. To offer you the most cost effective proposal.
>
> 4. To offer equipment that is commercially available with proven performance.

With the above concerns in mind and having considerable experience in bulk materials handling systems, we have used our judgment to offer you equipment that is industry standard for power plants. ...

We have an experienced project team available and are prepared to accept this contract and execute our obligations to your satisfaction. ...

Exhibit B to Dearborn's Opposition, pages 5 and 6 of 62.

In addition, the following statements and representations appear in "Appendix L – Dearborn Mid-West Conveyor Experience" to the DMW Proposal:

**Bulk System Solutions**

**Solutions**

**The Most Important Service to Our Customers**

Furnishing conveyor equipment is only one part of the Dearborn Mid-West Conveyer story. Our most important product is complete, high technology systems that solve materials handling problems with the greatest degree of efficiency. To accomplish this objective, we manufacture a broad line of products and provide the full range of services required to take a new bulk handling system from start to finish. ...

DMW is committed to providing the highest quality engineering, products, and construction expertise. ...

Dearborn Mid-West enjoys an international reputation for its capabilities in designing and building bulk handling systems. ...

Ex. 1, Appendix L, p. L-16.

**Commitment to Excellence**

**Engineering Excellence**

When it comes to solving the bulk material handling problems, our engineering staff is second to none. We have been able to attract this high level of talent due to our commitment to engineering excellence ....

Dearborn Mid-West sales application engineering, detail manufacturing, project management and field installation groups have brought experience in all kinds of bulk handling systems. Moving coal, overburden, limestone, sludge, ash, gold, ore, fertilizer, cement, wood chips, and a variety of other bulk materials all falls within the scope of our expertise. ...

Ex. 1, Appendix L, p. L-18.

**Our Lines Move Products Around the Globe**

DMW products can be found worldwide. From automotive and bulk handling to industrial manufacturing systems, DMW's experience translates into flawless, on-time and complete turnkey material handling systems.

From the Paint Shop through Final Assembly, Dearborn's "Team Approach" to simultaneous engineering, manufacturing, and testing assures equipment reliability on day one of the launch.

Ex.1, Appendix L p. L-31.

Express warranties, having been created during the bargaining process and being part of

the basis of the bargain, are contractual. *Corral v. Rollins Protective Services, Inc.*, 240 Kan. at

685-686, 732 P.2d at 1265-1266. Moreover, it is the general rule that express warranties, once

made, may not be disclaimed. *Ray Martin Painting, Inc. v. Ameron, Inc.*, 638 F.Supp. at 774.

A plain reading of the "Warranties" provision does not support Dearborn's position.

Dearborn's argument that the "Warranties" clause limits Dearborn's liability in this case is also

contrary to the uncontroverted facts and controlling Kansas law. In addition, any uncertainty in the meaning of the clause is to be construed against Dearborn as the drafter of the provision and party responsible for the language recited in such provision. The case law clearly supports application of the rule in this case that Dearborn should not benefit from its interpretation of a provision Dearborn drafted.

Contrary to Dearborn's arguments and authorities, the "Warranties" clause does not apply to Rand's damage claims.

**IV.    As a matter of law and based upon the uncontroverted facts, partial summary judgment should be entered in favor of Rand on Count III that Dearborn must indemnify Rand for its "damages, losses and expenses," which include liquidated damages paid by Rand as well as Rand's attorney's fees.**

Rand further seeks a ruling from the Court that Dearborn is required pursuant to the terms of the purchase order contract to indemnify Rand for "claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from performance of [Dearborn's] Work under [the] Purchase Order Agreement," which includes $216,546.03 Rand paid for labor, material and subcontract costs, $766,000.00 assessed against Rand as the result of the 10-day delay in providing the Air Force with a fully operational conveying system and attorneys fees incurred.

The parties agree that the unambiguous "Terms and Conditions of the Purchase Order Agreement" provide:

**Indemnification**

To the fullest extent permitted by law, the Supplier shall defend, indemnify and hold harmless the Owner and Contractor and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from performance of the Supplier's Work under this Purchase Order Agreement, but only to the extent caused in whole or in part by acts or omissions of the Supplier, the Supplier's Sub-suppliers, anyone directly or indirectly employed by them or anyone for

27

whose acts they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder. ... ;

Doc. 53-8, Exhibit A-7 to Doc. 53 "Rand's Motion."

In response to Rand's request for partial summary judgment on its claim for contractual indemnity, Dearborn asserts that Rand is not entitled to indemnification because Dearborn did not breach its contract with Rand. Dearborn further argues that as a matter of law, it is not required to indemnify Rand for its alleged "liquidated damages" or for its "attorney's fees."[5]

For the following reasons, Dearborn's arguments are without merit and partial summary judgment should be entered in favor of Rand on Count III.

## A. Rand's is entitled to be indemnified by Dearborn regardless of whether it is determined that Dearborn breached the parties' contract.

Dearborn's representation that its obligation to indemnify Rand must be preceded by a finding that Dearborn breached the contract is an inaccurate statement of the law and misconstrues the plain language of the indemnification clause.

If the court can ascertain the intent of the parties "by construing the document from its four corners," the rights and obligations under an indemnification clause involves a matter of law to be decided by the court. *See Crane Construction Co. v. Klaus Masonry,* 71 F.Supp.2d 1125, 1134 (D.Kan.1999).

The indemnification clause in this case provides that "[D]earborn ... shall ... indemnify and hold harmless ... [Rand] from and against claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from performance of [Dearborn's]

---

[5] The Pre-Trial Order lists the following defenses to Rand's claim for contractual indemnity: "Dearborn asserts that this claim is duplicative of Rand's other breach of contract claim and arises from the same express contract between the parties. Dearborn further asserts that the quoted provision is not a prevailing party provision, and Rand has no right to recover its attorney's fees in connection with the present litigation." (Doc. 46, pp. 12-13). There is no mention by Dearborn of any defense to Rand being indemnified for "liquidated damages."

work under this Purchase Order Agreement, ... to the extent caused in whole or in part by acts or omissions of [Dearborn], [Dearborn's] Sub-suppliers, anyone directly or indirectly employed by them or anyone for whose acts they may be liable,... ."

This provision plainly provides that Dearborn has a duty to indemnify Rand for all "claims, damages, losses and expenses, including but not limited to attorney's fees" arising out the performance of Dearborn's work. The meaning of the phrase "arising out of" in the context of a similarly worded indemnification clause has been held by the courts to impart a more liberal concept of causation than "proximate cause." *See Dixon v. Certainteed Corp.*, 944 F.Supp. 1501, 1507 (D.Kan.1996). Thus, where a causal connection exists between the injuries or loss and the indemnitor's work, there connection is sufficient to satisfy the "arising out of" test. *Id.*

Returning to the facts in this case, the "causal connection" between Dearborn's work and the resulting damages suffered by Rand has clearly triggered Dearborn's duty to indemnify Rand for its "claims, damages, losses and expenses, including but not limited to attorney's fees."

**B.    Dearborn must indemnify Rand for its payment of "liquidated damages."**

Dearborn makes a two-pronged argument in support if its claim that Rand is not entitled to indemnification for its payment of $766,000 in liquidated damages. First, Dearborn argues that it is not liable for such sum because Rand voluntarily agreed to the $766,000 reduction in its contract with Three Phase. Second, Dearborn relies on an alleged "exclusion" applicable to liquidated damages as shielding it from liability to Rand for such damages. As will be discussed in the paragraphs that follow, the applicable case law does not support either argument.

### *Rand and Three Phase incorporated the liquidated damages provision in their contract by reference.*

Dearborn claims that the contract between Rand and Three-Phase omitted the liquidated damages clause. Based upon the allegation that "Rand had no legal obligation to pay liquidated

29

damages," Dearborn contends that "Rand voluntarily accepted a [$766,000] reduction in its contract with Three Phase." Dearborn's arguments ignore the provisions found in the contract between Rand and Three-Phase.

Directing the Court's attention to the contract, Three Phase is listed as the "Contractor," Rand is the "Subcontractor" and the Department of the Air Force is names as the "Owner." The contract states as follows:

ARTICLE 1 THE SUBCONTRACT DOCUMENTS

§ 1.1 The Subcontract Documents consists of (1) this Agreement; (2) the Prime Contract, consisting of the Agreement between the Owner and Contractor and the other Contract Documents enumerated therein; . ...These form the Subcontract, and are as fully a part of the Subcontract as if attached to this Agreement or repeated herein. ... An enumeration of the Subcontract Documents, other than modifications issued subsequent to the execution of this Agreement, appears in Article 16.

\* \* \*

ARTICLE 16 ENUMERATION OF SUBCONTRACT DOCUMENTS

§ 16.1 The Subcontract Documents, except for Modifications issued after execution of this Subcontract, are enumerated in the sections below.

§ 16.1.1 This executed AIA Document A401-2007, Standard Form of Agreement Between Contractor and Subcontractor.

§ 16.1.2 The Prime Contract consisting of the Agreement between the Owner and Contractor dated as first entered above and the other Contract Documents enumerated in the Owner-Contractor Agreement.

( Doc. 53-4, Exhibit A-3 to Doc. 53 "Rand's Memorandum," pp. 1, 2, 14).

Dearborn's claim that Rand's contract with Three Phase does not provide for the assessment of liquidated damages against Rand is based solely on the fact that § 9.3 of the agreement, which provides in relevant part "insert provisions, if any, for liquidated damages relating to failure to complete on time," was left blank. As the following discussion will demonstrate, Dearborn's reliance on §9.3 is misplaced.

General principles of contract law provide that the court is to discern the parties' intentions as revealed in the contract itself. *Pay Phone Concepts, Inc. v. MCI Telecommunications Corp.,* 904 F.Supp. 1202, 1209 (D.Kan.1995). In addition, contract law recognizes that incorporation by reference is generally effective to accomplish its intended purpose. *Id.* A contract may incorporate an extraneous writing by reference, and the writing becomes a part of the contract so as to effectuate the specific purpose intended by the parties. *Ribeau v. Katt*, 681 F.3d 1190, 1196 (10th Cir. 2012).

Dearborn readily admits that "liquidated damages were provided for in the contract between the Air Force and Three Phase." Dearborn's Opposition, p. 34. Because the contract between Three Phase and Rand expressly incorporates the Air Force-Three Phase "prime contract" by reference, Dearborn's contention that the liquidated damages provision was omitted by the parties from the Three Phase-Rand contract also fails as a matter of law.

Given the fact that Rand was in fact legally obligated under its contract with Three Phase for liquidated damages assessed by the Air Force, Dearborn's arguments and authorities regarding the effect of "voluntary settlements" need not be addressed by Rand. However, Rand must point out that there is absolutely no evidence that would support Dearborn's apparent position that $766,000 was paid pursuant to a settlement agreement.

***The provision addressing payment of "liquidated damages" set forth in Dearborn's proposal does not apply to a claim for contractual indemnification.***

Dearborn relies on the following provision found in Appendix F as supporting its argument that Rand is barred seeking indemnification for "liquidated damages:"

### Section F 52.211-12-Liquidated Damages

DMW equipment suppliers are not prepared to accept any liquidated damages for delivery delays, as such no provision is made in our bid.

Despite the lack of *any* "express unequivocal disclaimer" language in the provision, Dearborn contends that the clause must be read as shielding it from any and all liability for liquidated damages in this case.

It is worth noting that two paragraphs down from the "liquidated damages" provision is the following clause:

5.   Taxes
     All taxes are excluded

Therefore, Dearborn's argument begs the question why did it not use this same unequivocal language disclaiming liability for liquidated damages, if it was that was its intent?

A contract must be enforced according to its plain, general, and common meaning in order to ensure that the parties' intentions are enforced. *Kansas Penn Gaming, LLC v. HV Properties of Kan., LLC*, 727 F.Supp.2d 1100, 1110 (D.Kan.2010).

Turning to the language chosen by Dearborn when it drafted the provision at issue, the clause references "DMW equipment suppliers" and then specifically limits the scope of the exception by specifying "liquidated damages for delivery delays." The language of the exception, when given its plain and ordinary meaning and read according to the sense of the terms used, applies to "delivery delays" arising from transporting "equipment" to the job site

Such an interpretation gives effect to all the terms in the clause and provides a reasonable interpretation to the provision at issue. *See Schell v. OXY USA, Inc.* 822 F.Supp.2d 1125, 1139 (D.Kan. 2011).

Therefore, since the liquidated damages in this case resulted from the forced shut-down of the conveyor system due to design defects after it was delivered, installed and started at the job site, liquidated damages paid by Rand are recoverable from Dearborn.

In addition, the fact that Dearborn wrote the contract provision at issue weighs in favor of Rand's interpretation. The "common law rule" directs the court to construe the terms of a writing against the drafter. *Daggett v. Board of Public Utilities of Unified Government of Wyandotte County/Kansas City,* 46 Kan.App.2d 513, 520, 263 P.3d 847, 85-852 (2011). "The purpose for the rule 'is to protect the party who did not choose the language from an unintended or unfair result.'" *Id.* (quoting *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 63, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995)).

The alleged "exclusion" does not apply to the facts in this case and, therefore, Dearborn must indemnify Rand for payment of liquidated damages.

### *If for some reason both clauses apply, the indemnification clause prevails. .*

Finally, Dearborn contends that if there is a conflict between the indemnification clause and the liquidated damages provision, the "specific" liquidated damages clause will prevail over the "general' indemnification provision. Once again, Dearborn's argument must be rejected.

The purchase order contract containing the indemnity clause was entered into after and, in fact, incorporated the DMW proposal. SOF 11; Doc. 53-8, Exhibit A-7 to Doc. 53 "Rand's Memorandum."

The rule applicable to all contracts is that prior stipulations and agreements are merged into the final contract. *Nelson Energy Programs, Inc. v. Oil & Gas Technology Fund, Inc.,* 36 Kan.App.2d 462, 466, 143 P.3d 50, 54 (2006). Under Kansas law, even a "written contract may be varied, modified, waived, annulled, or wholly set aside by any subsequent executed contract." *Owens v. City of Bartlett, Labette County,* 215 Kan. 840, 528 P.2d 1235, 1240 (1974).

Any conflict between the two writings will be resolved in favor of the indemnification clause given that all prior negotiations and agreements were merged into purchase order contract.

33

Therefore, for this additional reason, the "liquidated damages" provision at issue does not apply to Rand's claim for contractual indemnification.

### C. Rand's claim for attorney's fees are also recoverable under the parties' contract as a matter of law.

As noted above, Rand seeks indemnification in Count III of the Complaint from Dearborn under the terms of the purchase order contract for its "claims, damages, losses and expenses, including but not limited to attorney's fees" arising out of and resulting from Dearborn's failure to design, fabricate and supply to Rand a conveyor system that met the performance requirements set forth in the Solicitation No. FA 5004-09-R-C007 specifications. Dearborn argues that the "attorneys' fees" sought by Rand are not recoverable as a matter of law. Once again, Dearborn has taken an untenable position.

Dearborn correctly states that Rand seeks to recover its attorneys' fees under the following "Indemnification" provision set forth in the "Terms and Conditions of the Purchase Order Agreement:"

> To the fullest extent permitted by law, the Supplier shall defend, indemnify and hold harmless the Owner and Contractor and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from performance of the Supplier's Work under this Purchase Order Agreement, but only to the extent caused in whole or in part by acts or omissions of the Supplier, the Supplier's Sub-suppliers, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder. ...

Under Kansas law, attorney fees are recoverable in suits to enforce an indemnity agreement if there is express contractual language to that effect. *Chetopa State Bancshares, Inc. v. Fox,* 6 Kan.App.2d 326, 333-334, 628 P.2d 249, 256 (1981).

In *Chetopa State Bancshares*, the indemnification provision at issue, which was included in a contract for sale of stock, stated that sellers agreed to indemnify purchaser against any

"expense (including reasonable attorney's fees) suffered * * * by [purchaser] * * * , arising from, or as a result or in respect of, the breach of any warranty, representation or covenant made by Sellers." 6 Kan.App.2d at 327, 628 P.2d at 251. The court concluded that this "express contractual language" required the sellers to reimburse the purchaser's assignee for attorney fees incurred by it in suit to enforce indemnification rights under the contract. 6 Kan.App.2d at 333, 628 P.2d at 255-256.

See also *National Minority Supplier Development Council Business Consortium Fund, Inc. v. First National Bank of Olathe,* 83 F.Supp.2d 1200, 1204-1205 (D.Kan.1999)(Plaintiff entitled to recover attorneys fees for breach of contract action where indemnification clause contains express reference to such fees).

Contrary to Dearborn's reading of *GFSI Canada Co. v. Fletcher Leisure Group, Inc.,.* 2012 WL 2045293 (Kan. App. 2012), the court's decision in that case actually supports Rand's position that it is entitled to recover attorneys' fees it has incurred pursuing its claims against Dearborn.

The provision at issue in *GFSI* stated as follows:

21. Indemnification; Damages.

(a) Fletcher will indemnify and hold harmless Gear and its directors, officers, employees and agents from and against, and in respect of, any and all claims, demands, losses, obligations, liabilities, damages and deficiencies, costs and expenses (including, without limitation, interest, penalties, court costs, settlement costs, costs of investigation and *reasonable attorneys' fees* ) (collectively, "Damages"), incurred by any such parties and arising out of, resulting from or relating to:

(i) any breach by Fletcher of its representations, warranties or obligations under this Agreement,

* * *

(d) If a claim for indemnification involves the claim of *any third party* and the indemnifying party confirms in writing its responsibility for the liability, if

established, the indemnifying party will be entitled to participate in and, to the extent it desires, to assume control over (and all expense with respect to) the defense, settlement, adjustment or compromise of the claim. The indemnified party will have the right to employ separate counsel in any third-party action or claim and to participate in the defense thereof at its own expense." (Emphasis by the court.)

In *GFSI*, the indemnitor (Fletcher) argued that the specific reference in paragraph (d) to a "third party" limited recovery of attorneys' fees to actions brought against third-parties and did not allow fees for claims brought against parties to the contract. The court disagreed holding that parties' contract authorizes the award of reasonable attorney fees in suits between the parties for breach of contract. *Id.* at *15.

Fletcher, as does Dearborn in the present case, cited *Polaris Restaurants, Inc. v. Village Enterprises, Inc.,* 2007 WL 2819932 (Kan.App.2007) and *Bretches v. Curtis Machine Co.,* 2005 WL 1429904 (Kan. App 2005) in support of its position that the indemnity provisions apply only to claims by third parties and not to claims by parties to the contract. Gear Canada (indemnitee) responded "that the provision by its very terms says that Fletcher will indemnify and hold harmless Gear ... from ... any and all claims ... arising out of, resulting from or relating to ... any breach by Fletcher" under the agreement, and the provision says that the indemnification will include the costs of any suit, including the payment of reasonable attorney fees."

The appellate court found *Polaris Restaurants* and *Curtis Machine Co.* "to be of limited help" holding that the ruling in both cases "was clearly dependent upon the exact wording of the contract provision at issue there." *Id. at *14.*

According to the court in *GFSI*, "three considerations" support the conclusion that that parties' contract authorizes the award of reasonable attorney fees in suits between the parties for breach of contract:

First, the plain language of the provision is broadly written – the phrases "indemnify and hold harmless," "from ... any and all claims," "arising out of,

resulting from or relating to," and "any breach by Fletcher" stand out for the lack of any apparent limitation. Second, although the word "indemnify" is often used with respect to agreements to reimburse another for claims made by third parties, the word's basic meaning is broad enough to encompass both third-party and direct claims. ... Third, one of the provisions in paragraph 21 specifically refers to third-party suits, and in context it's clear that this provision is not applicable to the entirety of the paragraph.

*Id.* at *14-15.

Considering "the overall structure of section 21 (including its fourth paragraph, on third-party claims) along with the broad language of the indemnity provision (contained in the first two paragraphs) and the general definition of indemnify," the court concluded that the "contract authorized the award of reasonable attorney fees in suits between the parties for breach of contract." *Id.* at *14-15.

Returning once again to the provisions found in the purchase order contract in the present case, as in the *GFSI* case, the "Indemnification" provision is broadly written in that it contains the phrases "indemnify and hold harmless," "from and against claims, damages, losses and expenses, including but not limited to attorney's fees claims," "arising out of, resulting from," and "performance of [Dearborn's] Work under this Purchase Order Agreement."

Whether the court has the authority to award attorney fees is a legal question. *Id.* at *14. Applying Kansas law to the language found in the "Indemnification" clause, Rand is entitled to recover as a matter of law its "reasonable attorneys' fees" from Dearborn.

Dearborn is clearly obligated to indemnify Rand for "claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from performance of [Dearborn's] Work under [the] Purchase Order Agreement," including $216,546.03 paid for labor, material and subcontract costs, $766,000.00 assessed as the result of the 10-day delay in providing a fully operational conveying system and attorneys fees.

The meaning and legal effect of written instruments are matters of law exclusively for the

court and not questions of fact for determination by the jury. *Cline v. Southern Star Cent. Gas Pipeline, Inc.*, 356 F.Supp.2d 1203, 1216 (D.Kan. 2005). Dearborn is liable under the plain terms of the purchase order contract to indemnify Rand.

Because Rand has met its burden of demonstrating that under the terms of purchase order contract, Dearborn is required to indemnify Rand as a matter of law for "claims, damages, losses and expenses, including but not limited to attorney's fees," partial summary judgment should also be entered on Count III.

### Conclusion

WHEREFORE, Plaintiff Rand Construction Company respectfully requests the Court grant its motion for partial summary judgment on Counts I and III of its Complaint, and for such other and further relief as the Court deems just and proper.

Respectfully submitted,

MANZ SWANSON & MULHERN, P.C.

*/s/ Theresa Shean Hall*

Eric T. Swanson KS Fed Bar 70407
Theresa Shean Hall KS Fed Bar 78079
1000 Walnut – Suite 800
Kansas City, Missouri 64106
Tel.: (816) 472-5310
Fax: (816) 472-5320
Email: eswanson@msmlawkc.com
thall@msmlawkc.com
**ATTORNEYS FOR PLAINTIFF RAND CONSTRUCTION COMPANY**

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of February, 2013, the above and foregoing document was electronically delivered to the following persons, along with a certificate of service, filed with the Court:

Thomas R. Buchanan
Greg T. Spies
Linda C. McFee
McDowell, Rice, Smith & Buchanan
605 West 47th Street, Suite 350
Kansas City, Missouri 64112
Phone: 816-753-5400
Facsimile: 816-753-9996
tbuchanan@mcdowellrice.com
lmcfee@mcdowellrice.com
**ATTORNEYS FOR DEFENDANT/**
**THIRD-PARTY PLAINTIFF DEARBORN**
**MID-WEST CONVEYOR CO.**

S. Owen Griffin   KS# 21711
Troppito & Miller, LLC
105 East Fifth Street – Suite 500
Kansas City, Missouri 64106
Phone: (816) 221-6006
Facsimile:(816) 221-6446
sog@troppitomiller.com.

Mr. Robert W. Goff
Denton & Keuler
P.O. Box 929
Paducah, KY 42002-0929
Phone:       (270) 443-8253
Facsimile:   (270) 442-6000
rgoff@dklaw.com
**ATTORNEYS FOR THIRD-PARTY DEFENDANT/**
**COUNTERCLAIMANT ARCH ENVIRONMENTAL**
**EQUIPMENT, INC.**

*s/ Theresa Shean Hall*

_____
Theresa Shean Hall