IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

RAND CONSTRUCTION COMPANY,
        Plaintiff,

        vs.                            Case No. 11-2479-JTM

DEARBORN MID-WEST CONVEYOR CO.,
        Defendant.

        and

ARCH ENVIRONMENTAL EQUIPMENT, INC.,
        Third-Party Defendant.

MEMORANDUM AND ORDER

This case arises from an Air Force project for the construction of an automated coal-fueled power plant in Alaska. After installation of a new conveyor system was delayed, the Air Force assessed liquidated damages against the General Contractor. The parties to the present action are subordinate contractors who dispute among themselves where the ultimate responsibility for those damages, and the underlying failure of the conveyor system, should rest. All of the parties have submitted summary judgment motions, which are resolved as provided herein.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the

court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

*1. Facts Relating to Rand and Dearborn Motions*

On April 28, 2009, the Air Force issued Solicitation No. FA 5004-09-R-0007, for the construction of, in pertinent part, a coal conveyor system for an automated coal-fueled power plant. The solicitation required this construction to take place in accordance with the drawings and specifications and to furnish, fabricate, and install all labor, material,

equipment, supervision, work and facilities necessary to complete the project. The solicitation provided that all work was to be performed strictly in accordance with the included drawings and specifications.

With regard to V-plows and lift tables, "Part 4 - Design Criteria" of the specifications provided:

4.01    The following design criteria applies:

. . . .

I.      The Owner will operate the coal handling systems twice daily; however, all components shall be designed for continuous, severe, heavy duty, minimum maintenance, 24 hours per day, 365 days per year operation in a coal-fired power plant environment.

J.      The conveyor system shall be designed to minimize spillage.

The Air Force contract does not explicitly quantify the maximum amount of spillage permitted.

The Air Force awarded the prime contract to Three Phase Electrical, Inc. on September 11, 2009. Three days later, Three Phase contracted with Rand to demolish the old conveyor system and install new conveying equipment.

Rand's contract with Three Phase does not explicitly provide for liquidated damages. Section 3.3.1 of that contract provides:

Liquidated damages for delay, if provided for in Section 9.3 of this Agreement, shall be assessed against [Rand] only to the extent caused by the Subcontractor or any person or entity for whose acts [Rand] may be liable, and in no case for delays or causes outside the scope of this Subcontract.

Section 9.3 itself does not expressly provide for liquidated damages. Section 9.1 and 9.3 define the dates of commencement and substantial completion; both contain form instructions to insert relevant dates where appropriate in the available blank spaces. The parties to the contract duly provided these dates by typewritten insertion. Section 9.3 contains the further instruction "*Insert provisions, if any, for liquidated damages relating to failure to complete on*

*time*." (Italics in original) The space following has been left blank. There are no liquidated damages provisions inserted into the space provided in Section 9.3.

Rand sought bids for design and supply of new conveying equipment to be installed in the utility plant at Eielson Air Force Base. On May 4, 2009, Rand issued a Request for Proposal for subcontract work on the Project, including the coal tripper conveyor. That RFP included portions of the Air Force specifications and requirements for the Project.

Dearborn was given a copy of the solicitation. Dearborn then gave Rand its proposal. In a June 8, 2009 letter, Dearborn wrote:

> We are pleased to submit our proposal, one (1) original, one (1) copy and one (1) electronic copy for the design, fabrication, and delivery of the Material Handling System for the above referenced project.
>
> Our offer is generally in compliance with the specifications issued with the request for proposal dated May 9, 2009 and amendments 1, 2 and 3. Our clarifications and exceptions are listed in Appendix F to our proposal….

Appendix F contains exceptions and clarifications to the specifications. It provides in part:

> **Section F 52.211-12 - Liquidated Damages**
>
> DMW equipment suppliers are not prepared to accept any liquidated damages for delivery delays, as such no provision is made in our bid.
>
> **Warranties.**
>
> DMW will provide replacement goods for defective equipment but removal and installation would be by others.

Rand contracted with Dearborn to provide a plow system for the conveyor, and on October 7, 2009, Rand entered into a Purchase Order Agreement with Dearborn under which Dearborn was to "design and supply a plow conveyor system." The Purchase Order, signed by Dearborn, provides in part:

> Indemnification
>
> To the fullest extent permitted by law, the Supplier shall defend, indemnify and hold harmless the Owner and Contractor and agents and

employees of any of them from and against claims, damages, losses and expenses, including by [sic] not limited to attorney's fees, arising out of or resulting from performance of the Supplier's Work under this Purchase Order Agreement, by [sic] only to the extent caused in whole or in part by acts or omissions of the Supplier, the Supplier's Sub-suppliers, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder. Such obligation shall not be construed to negate, abridge or otherwise reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this paragraph.

In claims against any person or entity indemnified under the paragraph above by an employee of the Supplier, the Supplier's Sub-suppliers, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, the indemnification obligation under the preceding paragraph shall not be limited by a limitation on amount or type of damages, compensation or benefits by or for the supplied or Supplier's Sub-suppliers under workers' or workmen's compensation acts, disability benefits or other employee benefit acts.

Lawrence Grant (of Rand) and Jim Smothers (of Dearborn) discussed the schedule for delivery. Rand cites Grant's deposition testimony stating that he explicitly spoke to Smothers the about the assessment of liquidated damages for late delivery, and that Smothers told him that Dearborn was excluding liquidated damages due to delivery delays. According to Dearborn, Smothers told Grant that Dearborn believed the proposal expressly disclaimed liquidated damages.

On or about November 19, 2009, Dearborn issued its Purchase Order No. 09-76178-024-00 to Arch Environmental to supply certain specified equipment, parts, manuals, drawings, calculations, design review and guaranty.

Arch supplied equipment to Dearborn including five of its standard V-plows and lift beds, and Dearborn in turn supplied these to Rand. Rand knows of no other manufacturers' standard V-plow system on the market, other than the one supplied by Arch.

Shortly before the old conveyor system was shut down, Dearborn's Lloyd Sanders emailed Rand's Larry Grant in response to concerns about delays in transporting the

conveyor system, indicating its understanding that the proposal excluded damages for delays.

> Today is June 7th, less than one week prior to the shutdown. We will proceed immediately, but note that a two week time table puts you at the end of your install window. I am recommending that the customer be advised that this change creates a very serious risk to completing the change over within the 10 day shutdown. I also recommend that a request be made for an appropriate schedule extension to include this change. Please note that as stated in our proposal, DMW will not be responsible for delays caused by this addition.

The facts establish that the contract between Rand and Dearborn is comprised of Dearborn's June 8 proposal and the October 7, 2009 Purchase Order. As part of its design and supply services to Rand, Dearborn solicited and received a quote from Arch for a multi-plow system with lift tables and controls, and Dearborn issued a purchase order to Arch to design and supply plows for the project. Arch's standard V-plow was the only such standard-design V-plow on the market.

The power plant at Eielson Air Force Base was shut down in mid-June of 2010, so that Rand could remove the existing conveying equipment and then install the new conveying equipment supplied by Dearborn. Rand Construction was responsible for the installation and adjustment of the equipment. Arch designed and supplied the plows to Dearborn as part of Dearborn's services to Rand on the Project.

On or about June 26, Rand tried to start the new conveying equipment. According to Grant, the new conveying equipment failed to perform — serious coal "back-up" and spillage problems occurred. An Air Force official told Grant the system was "unacceptable, we've got to remedy it."

Dearborn objects to Grant's testimony, on the grounds that the assertion requires expert testimony, and Grant has not been designated as an expert witness. It further argues that some spillage was contemplated by the parties, as the system contemplated a design which would "minimize" spillage. Dearborn alleges that Rand failed to properly adjust the return V-plow, allowing coal spilling onto the return belt to travel to the tail

pulley and become trapped between the belt and pulley causing the belt to mis-track and stop.

Dearborn supports this claim by citing Grant's deposition, but does so by misconstruing the testimony. At one point, Grant was asked if Rand had tried to repair the conveyor to prevent coal from getting into the tail pulley, and he responded that "We made adjustments to it [but] they were still not adequate." In context, Grant did not direct this fault at Rand, but at the system itself. He clearly testified that Rand could not adjust the problem away because the conveyor "wasn't able to run long enough to make any adjustments" without becoming stuck.

When counsel suggested this meant the system "was so sufficiently far out of adjustment that it was not serving its purpose," Grant explicitly denied this, saying "That's not fair." He explained that the slack in an empty conveyor prevented adequate adjustments before starting the system with a full load. And the system could not be adjusted incrementally because of the speed of the spill:

> We were only able to run at the beginning for a very few seconds before there was enough coal on the belt to go up and around the tail pulley. There wasn't enough time to make adjustments on there. We're talking less than a minute that the conveyer was running.

Because the only basis for Dearborn's allegation of fault by Rand is Grant's testimony taken out of context, the court denies the requested finding.

Again citing Grant's testimony, Dearborn asserts the relative success of the system, by asserting that it conveyed some 20 tons of coal into Bin 1 on June 26, 2010, while generating only spillage of about eight to ten five-gallon buckets. Again, this fails to fairly set forth Grant's testimony. Grant stated that at the end of the day, the system had delivered "[s]everal tons" into Bin 1 after the testing had been completed, but that "[w]e never made it far enough to get hardly any coal in Bin 2." More importantly, the problem with the spillage was not its absolute amount but its effect – "It would still spill quick enough that we couldn't run more than about a minute before it shut down" automatically.

Lloyd Sanders, the Project Manager of Dearborn, prepared a time line of the events giving rise to this lawsuit. Sanders wrote to Arch the day after the test run stating that the system "cannot run with the coal trapped as the table jams up with coal." Sanders indicated in an October 8, 2010 letter that the plows and lift tables did not function as specified, in that the lift tables and plows failed to properly remove material from the conveyor belt.

Robert Shelton, Dearborn's liaison and field representative, helped with the installation of the system, although the agreement between Rand and Dearborn provided that installation and erection of the equipment would not be performed by Dearborn. In his deposition, Shelton agreed that the system's performance during the start up "[w]as not acceptable." Shelton also testified that there "was no problem with the installation" of the Arch V-Plow and lift tables, and that Rand "did a very good job" in installing the system. Shelton testified that the root cause of the problem was the plow angle.

According to Jesse Sanchez, the Project Engineer for Dearborn, the original V-Plow system did not work as intended.

After consultations between the Air Force and Rand, Arch delivered a new V-Plow and lift tables. When these were installed, they succeeded in eliminating spillage. The new plow system effectively and efficiently moved the coal to the bunkers. The Air Force accepted the new system on July 7, 2011.

On August 5, 2010, the Air Force sent to Three Phase an Amendment of Solicitation/ Modification of Contract. In addition to assessing $766,000.00 in liquidated damages against Three Phase, the Amendment provided:

The reason for this contract unilateral modification is as follows:

1. To exercise the government's right to access [sic] liquidated damages from the contractor for 10 days of contractor caused delay by not delivering a operating coal delivery system at the end of the 13 day plant shutdown performance period.

Dearborn sent the Amendment to Arch on October 8, 2010. The cover letter to the Amendment stated:

> Attached please find the Government's Liquidated Damages assessed against Three Phase Electric for the delays in providing an operating coal plow conveyor system. The delay is the result of the lift tables and plows not functioning as specified at the end of the original shutdown. The lift tables and plows failed to properly remove material from the conveyor belt. Liquidated Damage letter from Eielson AFB attached.

On or about July 7, 2011, the new conveying system was operational, eliminated spillage and was accepted by Rand and the Air Force.

To make the new system operational, Rand incurred expenses totaling $216,546.03 for labor, material and subcontract costs. However, the expense report does not separate labor and travel expenses that were incurred due to the revision of the system, from labor and travel expenses that would have been incurred regardless of whether Rand chose to replace the original equipment with revised equipment.

Rand has incurred, and will continue to incur, attorneys fees as the result of the events referenced in this lawsuit. Rand has not paid Dearborn $316,600.00 of the contract price.

## 2. Facts Related to Arch's Motion

Arch is a small bulk materials conveying equipment supplier that has sold various pieces of equipment to Dearborn over the years. It has approximately 25 employees. Arch is not an engineering firm, and currently has no engineering department and has no engineer on staff, although it has employed engineers in the past.

In the late 1990s, Arch developed a diverter V-plow for the carrying side of the conveyor belt at customer request to divert boron. In total, Arch has supplied its diverter plow to a half dozen customers since it was developed.

A large part of Arch's business is the bulk conveyance of coal, specifically belt cleaners, skirting, seals and miscellaneous other products. Some 30% of its business is

conveyor belt cleaning products – scrapers and return plows. Arch makes two different belt plows: a return V-plow (which diverts material off of both sides of the belt), and an angle or single plow (which diverts material off only one side). A return plow mounts onto the return side of a conveyor belt to clean the belt in order to protect the tail pulley. Prior to the Alaska Air Force project, Arch's diverter v-plow was never used for moving coal.

Dearborn is a major player in the bulk conveying industry, with in-house engineers whose job it is to perform design calculations. It had previously bought equipment from Arch, and had used a purchase order containing its standard terms and conditions.

Dearborn sent Arch the complete Air Force Solicitation for the project, including the project specifications and original bid package. The Solicitation including the provision for daily liquidated damages.

In May, 2009, Dearborn first contacted Arch about the Alaska project. On October 28, 2009, Dearborn wrote:

> We have project in house for the Eielsen AFB in Alaska - At this time, we are looking into the possibility of using your "V-Plow Lift Table" in our design. I am requesting information from you so that we can design a functional mechanism that meets the requirements the customer is expecting. Attached is a "Preliminary" sketch of what we have in mind so far.

In addition, Dearborn and Arch communicated by email as to the design of the V-plow and lift tables.

After Dearborn was awarded the subcontract with Rand for the Project, Dearborn and Arch engaged in further discussions about Arch's V-plow system in which Arch provided specific design suggestions and details concerning the system to be provided at the Project. Dearborn did not provide Arch with a copy of its contract with Rand, and thus Arch was not aware at the time of contracting that Dearborn had expressly disclaimed any liquidated damages.

After numerous additional emails between Jesse Sanchez at Dearborn and Scott Howard at Arch, Arch issued a revised Quotation dated November 11, 2009, to Dearborn.

10

After it received the Quotation, Dearborn wrote in response:

> Thanks for the email. Please review your proposal once again and confirm the following:
>
> 1. Your best offer for all items excluding the electrical PLC control system. Price based on FOB job site.
> 2. Payment terms: Net 60 days.
> 3. Rates for field start up service.
>
> Your quick response will be appreciated.

Arch then wrote to Dearborn:

> Attached is the revised Arch Quote for the V-Plow Lifting System. As requested, we have removed the Controls from the quote. Shipping cost has been added but this is just an estimate. Shipping cost vary from day to day.
>
> The Net 60 Days Terms is a bit unusual for us and I will confirm that by tomorrow.
>
> With respect to the price quoted, we have previously reduced the price as far as we can.

Dearborn cites this e-mail as an indication that Arch agreed from the outset that its design of the V-plow and lift bed system would function, but this overstates what the e-mail actually says. The cited portion of the email only indicated that for no additional charge Arch would "provide drawing that will make the installation fit the existing convey." That is, the e-mail indicates only that Arch would help design the installation of the conveyor system. The e-mail, taken by itself, does not indicate that Arch was guaranteeing of the performance of the underlying design.

On November 16, 2009, an internal Dearborn email from Arun Saha to Rob Viard and Jesse Sanchez, stated:

> Rob & Jesse:
>
> Please note the following:
>
> 1. Arch Environmental, the manufacturer of the Reclaim V-Plows will make detail design and calculation to guarantee proper functioning of their V-Plows for filling the Bins. Arch to ensure reclaiming of all material on the belt without any overflow at the selected Bin. Note that current V-Plow, proposed by Arch is about 7 inches high including the 1-1/2 inch deflector plate above the Vplow.

This may change somewhat depending on the final design after receipt of the P.O.

2. The chute design is by DMW. However, Arch will review DMW's chute drawing in order to ensure: (a) the size and locations are correct, (b) minimize impact areas based on the material trajectory after reclaim, etc. DMW to submit design drawings to Arch for review.

Jesse can issue P.O. to Arch (excluding the PLC control system) so they can start their engineering.

The following day, Lloyd Sanders sent an internal email to Saha, providing, "Arch agrees to 60 day payment terms if we place order soon."

On November 19, 2009, Dearborn issued and emailed to Arch an Advanced Bill of Materials dated November 19, 2009, containing a purchase order number, a list of the equipment to be provided by Arch to Dearborn, the prices for that equipment, date for performance, shipping terms and payment terms. The Advanced Bill of Materials provided that it was "released by" Sanchez and "approved by" Sanders. The Advanced Bill of Materials was attached to an email cover sheet from Tom Joslin at Dearborn to Dennis Walsh at Arch which provided: "Please use the Purchase Order # shown above for items on the attached. Date Required is 4/1/10. "

Arch contends that the Advanced Bill of Materials constituted a purchase order, and cites the deposition testimony of Saha:

Q:  Okay. Looking at Exhibit 94 [the Advanced Bill], the front page there, it says it's an e-mail cover sheet to Dennis Walsh at Arch, correct?

A:  Uh-huh

Q:  Would it be your understanding that that means this was e-mailed to Dennis Walsh?

A:  Okay. The process is when you need something in a hurry, to make this document – from this document to correct this document takes several days. Because it is one Purchasing Department for all the projects, one purchasing. And to save time, if they are looking for some drawing or some information, what they do at this document, they e-mail or fax first and then this follows exact copy.

Q:  Okay. So they –

A: It appears that TJ, Tom Joslin, sent this before this was prepared, typed and send out officially –

Q: And when you say "this," he e-mailed Exhibit 94 –

A: Ninety-four, yeah.

Q: – before Exhibit 21 was prepared?

A: Twenty-one, yeah. That's my – I can – my understanding looking both of them.

Q: Once Arch received this e-mail that Exhibit 94, would you expect them to proceed on the project?

A: This is official document, they're supposed to. That's my understanding.

Q: Once Arch receives this Exhibit 94, would it be your understanding that there's an agreement with Arch to perform work on the project?

A: This is a document sent to Arch. It has a PO and a PO number is provided, so the difference between this and this is [the Purchase Order] the typed copy in the triplicate with Dearborn Mid-West format.

Q: Okay.

A: This is advanced copy.

Q: But would you consider Exhibit 94 to be a Purchase Order?

A: We gave a PO, I don't see why it should not be. We already gave a PO.

Thus, Arch contends that the contract was formed no later than November 20, 2009, when it issued a written confirmation of the order without asking Dearborn to acknowledge its acceptance of the terms. All of Arch's prior Quotations contained just such a request.

Dearborn contends that the Advanced Bill of Materials was simply a preliminary document, consistent with its standard practice, which expressly stated that a formal purchase order would be issued shortly. On the first page of the Advance Bill is the notation ""PLEASE ISSUE P.O. [Purchase Order] TO ARCH FOR THE FOLLOWING. QUOTE ATTACHED." That the Advanced Bill was not complete in itself is also reflected in its explicit provision that necessary drawings would be submitted "within (2) two weeks after issuance of purchase order." In addition, Dearborn has submitted evidence that it has

bought equipment from Arch in the past, and so Arch would have known that a purchase order would issue which was a part of the contract. Finally, both Rick Archer (the President of Arch) and Scott Howard (also of Arch) testified that the Purchase Order sent to Arch was the contract.

The Purchase Order provides in part:

ITEMS INCLUDED.

....

DETAIL DESIGN & CALCULATIONS TO GUARANTEE:

1. PROPER FUNCTION OF V-PLOWS FOR FILLING OF BINS

2. TO ENSURE RECLAIMING OF ALL MAT'L ON BELT WITHOUT ANY OVERFLOW AT THE SELECTED BIN. (NOTE: CURRENT V-PLOW PROPOSED BY ARCH IS ABOUT 7" HIGH INCLUDING THE 1-12" DEFLECTOR PLATE ABOVE THE V-PLOWS. THIS MAY CHANGE DEPENDING ON THE FINAL DESIGN AFTER RECEIPT OF THE P.O.)

REVIEW OF DMW'S CHUTE DRAWINGS IN ORDER TO ENSURE SIZE & LOCATIONS ARE CORRECT & MINIMIZING IMPACT AREAS BASED ON THE MATERIAL TRAJECTORY AFTER RECLAIM. (DMW WILL SUBMIT AUTOCAD DESIGN DRAWINGS TO ARCH FOR THEIR REVIEW.)

The Dearborn Purchase Order contained Dearborn's standard Terms and Conditions, including an indemnity provision, warranty provision, and entire agreement provision.

The indemnity provision in the contract provides:

15. <u>INDEMNIFICATION</u>:

If Seller, its employees, agents, or subcontractors, perform any work on DMW's premises or utilize the property of DMW, whether on or off DMW's premises, Seller shall defend, indemnify and hold DMW, its employees and agents harmless from and against any liability, claims, demands or expenses (including reasonable attorneys' fees) for damages to the property of or injuries (including death) to DMW, its employees or any other person arising from or in connection with such entities' performance of work or use of DMW's property, except for such liability, claim, demand or expense arising out of the sole negligence of DMW. Seller shall maintain Comprehensive General Liability Insurance, including Contractual Liability Coverage, with a combined single limit of not less than one million dollars ($1,000,000.00) per occurrence and shall name DMW as an additional

14

insured. Seller shall prevent liens of any nature from attaching to the premises or property of DMW or its customers.

The warranty provision in the contract provides:

9. <u>WARRANTY</u>:

Seller expressly warrants that all goods or services covered by this order shall be of first class quality and shall conform to the specifications, drawings, samples or descriptions furnished to or by DMW, and will be merchantable, of good material and free from defects, latent or patent. In addition, Seller acknowledges that Seller knows of DMW's intended use and expressly warrants that all goods covered by this order have been selected, designed, manufactured, or assembled by Seller, based on DMW's stated use, and will be fit and sufficient for the particular purposes intended by DMW. No materials may be substituted in lieu of those specified without DMW's prior written consent. Seller agrees to cooperate in DMW's defense of any claim or lawsuit wherein it is alleged that injury or damage was caused by defect of any kind in goods sold by Seller to DMW. DMW agrees to give Seller reasonable notice of such claims or lawsuits and a reasonable opportunity to compromise or settle same, and agrees to permit Seller to intervene in any such lawsuits as an additional defendant if Seller so elects. If a court wherein such a lawsuit is brought against DMW determines that the damages were caused by a defect in Seller's goods, or if DMW makes and Seller refuses a tender of defense of such lawsuit, DMW makes a settlement of same, in either event Seller will indemnify and save DMW harmless from any and all costs, expenses, fees (including reasonable attorneys' fees), judgments and payments made by DMW as a result thereof. It is agreed that this warranty shall survive acceptance and payment.

Finally, the Terms and Conditions provide:

27. <u>ENTIRE AGREEMENT</u>:
This order, together with the attachments, exhibits, or supplements, specifically referenced in this order, constitutes the entire agreement between Seller and DMW with respect to the matter contained herein and supersedes all prior oral or written representations and agreements. This order may only be modified by a purchase order amendment/alteration issued by DMW.

Arch never objected to the Purchase Order contract Terms and Conditions.

According to Arch, it always understood that the conveyor system designed by Dearborn was located on the tripper floor, where the coal would be quite small. Another Dearborn supplier reached the same conclusion as Arch. Thus, Arch understood that this particular implementation of its V-plow would be similar to the handful of other implementations. Arch's understanding of the size of the coal that would be impacting its plows was confirmed when it received Dearborn drawing L-021, which provided that the

coal would be 3/4 x 0". Arch did not know, and did not inquire, as to the size of the coal until well after it designed the V-plow system. Neither Dearborn's Advanced Bill of Materials nor the subsequent Purchase Order contained any reference to coal size.

Rick Archer admitted that Arch had no information concerning the size of the coal when his company bid the Project, nor when Dearborn and Arch entered into the Purchase Order contract. Archer testified that, based on Arch's experience with more than 100 coal-fired power plants, it felt comfortable with the anticipated material size to bid the project. Further, the size of coal is of limited relevance because Arch has admitted it has not performed any calculations or testing to determine the maximum or minimum size of material that its V-plows can be used to move.

On December 14, 2009, Jesse Sanchez at Dearborn sent a marked-up Arch drawing to Scott Howard at Arch. The original Arch drawing provided, "Material trajectory based on trajectory found on DMW DWG L-021." Sanchez wrote, "Not sure if this trajectory is correct, please verify per PO 09-761702400."

Scott Howard responded on January 7, 2010 , "There is not a formula in the CEMA Book to calculate this type of discharge trajectory. However, the belt speed and such are the same, so this should be close if it was calculated correctly at the discharge pulley by DMW."

Rick Archer testified that Dearborn's request for bid for a V-plow discharge system in a coal-fired power plant was "unusual." None of the people involved with any of the parties had previously had any experience with a diverter V-plow in a coal plant. Still, Archer testified that his company felt comfortable with using a diverter V-plow system for the Alaska project. Arch never told Dearborn that it felt the design was unusual.

On March 30, 2010, representatives of Dearborn, Rand and the Air Force inspected the V-plows and lift tables at Dearborn's fabrication facility. On April 3, 2010, Dearborn asked Arch to provide it with other projects, where the diverter V-plow was used as a

"proof of concept" as well as Arch's test results. Two days later, Arch provided a list of its prior projects involving diverter V-plows. Arch also told Dearborn that it was not equipped to perform any tests running coal.

Dearborn then asked which of the listed projects involved coal. Arch responded none.

On April 14, 2010, Dearborn wrote that "Our customer is still concerned about the ability of the plow to perform," and asked for contact information so the Air Force could speak with an Arch representative directly.

Rick Archer told an Air Force representative that Arch's diverter V-plow was not a routine product. The Air Force's concern seemed to be with the functioning of plows in general rather than the specifics of Arch's diverter V-plow.

The contract between Three Phase and the Air Force provided for a 10-day shutdown period during which Rand would disassemble the old conveying equipment and install the new conveying system. Due to materially different site conditions, Three Phase received a three-day extension.

Rand did not test the conveyor system until June 26, 2010. At that time and until July 7, 2010, Rand claims that it experienced problems with spillage from the conveyor. However, Rand also experienced numerous other issues, such as Rand's failure to properly adjust the belt cleaners.

According to Arch, the V-plows did not perform as desired because of the size of the coal – 3 to 5 inches rather than 3/4 of an inch. In addition, the coal was 6 to 6 ½ inches, rather than the 4 inches specified, overloading the plow.

However, Arch has admitted it has not performed any calculations or testing to determine the maximum or minimum size of material that its V-plows can be used to move. Moreover, Arch never asked about the size of the coal until after the design, and the Advanced Bill of Materials and the Purchase Order contain no reference to the size or

depth of the coal. The specifications cited by Arch were adopted after the contract was entered into. In addition, it is unclear what exactly the depth of the coal was in the Alaska plant.

As noted above, the Air Force assessed liquidated damages against Three Phase in the amount of $76,000 per day, for a total of $766,000. Three Phase did not object to the assessment, and gave no response to the Air Force's inquiry as to why it should not assess liquidated damages. Larry Grant of Rand was also involved in both decisions. He didn't attempt to separately determine if Rand was liable to Three Phase for liquidated damages.

After the Air Force required the redesign of the conveyor system, Arch supplied specially-designed custom plows to completely eliminate spillage

> On September 17, 2010, Rick Archer of Arch wrote to Dearborn and stated: Our goal is always to provide the customer with a product that meets their expectations. Sometimes the customer's expectations differ from the design specifications provided by the customer. In those cases, we will work very hard with the customer to supply an alternative product once it becomes evident that the actual conditions differ from the design specifications. In this matter, we have provided such at no extra cost to Dearborn.
>
> ....
>
> It remains Arch Environmental's position that we supplied a product that met the original design specifications. At no extra charge, we have supplied equipment that now complies with design criteria that was not originally specified.

*Conclusions of Law*

*A. Motions by Rand and Dearborn*

**1. Breach of Contract**

Rand seeks by summary judgment a determination that Dearborn breached the contract and is liable for its actual damages. In opposition, Dearborn seeks a determination that no breach of the contract occurred.

The parties do not dispute that under their agreement, Kansas law controls. Under Kansas law, a claim for breach of contract requires proof of "1) the existence of a contract

between the parties; 2) consideration; 3) the plaintiff's performance or willingness to perform in compliance with the contract; 4) defendant's breach of the contract; and 5) that plaintiff was damaged by the breach." *The Bradbury Co., Inc. v. Teissier-duCros*, 387 F.Supp.2d 1167, 1171 (D.Kan.2005). Here, the dispute between the parties centers on whether Dearborn breached the contract. The court finds that it did.

Dearborn agreed to provide a conveyor system which would generally meet the Air Force's specifications. The actual system provided, however, was materially deficient in meeting those goals.

Dearborn argues that it did not breach the contract because Rand failed to install the system appropriately, and because the system spilled only a relatively small amount of coal. Dearborn stresses that the contract required a system which was designed to "minimize spillage," but not absolutely prevent it. The court finds neither argument persuasive. As noted in the court's findings of fact, the evidence does not establish that Rand installed the system inadequately. Evidence from Dearborn's own employees establishes that it did. As Robert Shelton, Dearborn's liaison and field representative for the Project, testified that there "was no problem with the installation" and that "[Rand] did a very good job."

Dearborn's "minimal" spillage argument might have some merit if that were the only relevant contract specification, but it is not. The Air Force required a conveyor system which would "automate the coal unloading operations." That is, the conveyor system must be able was to convey the coal into bins at a rate of 150 tons per hour. Further, the system must "perform at the Design Capacity required to operate all production equipment connected at full design speeds as specified on the concept/design drawings," must "transport [the] coal through the system without jams, pressure, or damage," and "function in such a manner to provide a continuous flow to the downstream equipment." Dearborn acknowledged these requirements in its communications. It specifically represented to

Rand that "[w]e have designed equipment in accordance with the Conveyor Equipment Manufacturers Association's standards for continuous operation." The court finds that the "minimized" spillage requirement must be interpreted in light of the known goal of the project owner — a system which would operate continuously and achieve a specified bin fill rate.

Accordingly, Dearborn's attempt to "minimize" the spillage by quantifying the lost coal in terms of buckets is beside the point. It is uncontroverted that the system delivered by Dearborn failed to meet the design requirements because the spillage was sufficient and constant as to prevent continuous operations of the conveyor. Despite repeated efforts, they system could not be corrected to achieve the specified fill rate. The system could not be operated continuously because the spillage was sufficient to cause constant jamming. At the time of the installation, one of Dearborn's representatives wrote, ""We cannot run with the coal trapped as the table jams up with coal." In their depositions, Dearborn's representatives conceded the system was inadequate. [1]

Dearborn argues that the contract was fundamentally changed when the Air Force and Rand decided in implementing an entirely new standard, altering the "standard" V-plow and lift table design for one which effectively required no spillage at all. The court finds no support for this contention in the evidentiary record that the original specifications simply permitted a "standard" design. Rather, the underlying design demand remained constant — a conveyor system which would permit continuous operation. Not one which spilled so much coal as to prevent such operation.

Accordingly, the court finds that Dearborn's system breached the contract, and this resulted in substantial damages to Rand when it became responsible for the liquidated damages imposed by the Air Force.

---

[1] Nor does the court agree that the spillage was "minimal" even considered by itself. Tests showed that by the time the system had filled a mere 4% of the first bin, some 400 pounds of coal had been thrown onto the plant floor.

**2. Indemnification**

Rand seeks indemnification for those liquidated damages. Dearborn argues that it is not responsible under the agreement for liquidated damages because of certain contract exclusions, and because Rand voluntarily paid the liquidated damages, and was not legally required to do so.

As to the potentially relevant exclusions, Dearborn first relies on the portion of Section F which provides that "DMW will provide replacement goods for defective equipment but removal and installation would be by others."[2] The court finds that Dearborn errs in attempting to construe this limited provision into a general immunization from claims for indemnification.

The clause provides only that, if goods provided by Dearborn are defective, Dearborn will replace the goods at no charge, but will not pay the cost of removal and installation of those goods. That is, the provision only speaks to the price of the goods and the expense of replacement. The provision is silent as to other losses which might be incurred by Rand, and does not otherwise positively limit Dearborn's liability. If Dearborn wished to broadly disclaim all liability for indemnification, it had the burden to do so clearly. *See Daggett v. Board of Public Util.*, 46 K.an.App.2d 513, 515-520, 263 P.3d 847, 851-852 (2011). It did not do so. Given the fact that the proposal otherwise contains express warranties that the conveyor system will meet the Air Force's requirements, the court has no difficulty concluding that Dearborn is responsible for damages incurred due to the inadequate conveyor system.

Next, Dearborn cites the purported liquidated damages exclusion in Schedule F, and further cites this court's decision in *Law Co., Inc. v. Mohawk Const. and Supply Co., Inc.*, 702

---

[2] In addition, Dearborn cites testimony from Larry Grant of Rand as to his understanding of Schedule F. But Grant's own interpretation cannot vary the plain terms of the contract, which is a question of law for the court. *Peoples Mortg. Corp. v. Kansas Bankers Sur. Trust Co.*, 176 F.Supp.2d 1199, 1204 (D.Kan. 2001).

F.Supp.2d 1304, 1322-23 (D. Kan. 2010), to expansively read this provision. The court finds the exclusion inapplicable here, and the reliance on *Law v. Mohawk* misplaced. The exculpatory provision in that case provided a blanket exclusion of liability for all delays, and that "[e]xtension of time shall be the Contractor's sole remedy for delay." The clause provided no attempt to qualify the nature, type, or duration of the delay. 702 F.Supp.2d at 1306. In rejecting the contractor's subsequent damages claim on the grounds that the delay was too lengthy, and occurred for reasons not contemplated by the parties, the court specifically recognized the "very broad" nature of the provision as effectively excluding most of the contractor's damage claims. *Id*. at 1327.

Here, the exclusion relied on by Dearborn is carefully circumscribed — Schedule F states on that Dearborn was "not prepared to accept any liquidated damages *for delivery delays*." (Emphasis added). Here, Rand is alleging that Dearborn completely failed to comply with the terms of the contract which required designing and supplying a conveyor system which met the Air Force's specifications for a system capable of continuous operation. And, it may be noted, Dearborn *never* delivered such a system, delayed or not. Rand separately and directly contracted with Arch for such a design. The problem was not simply the timeliness of the delivery, but the entire design of the conveyor system. Again, the provision must be construed against its drafter. *See Daggett,* 46 Kan.App.2d at 520. Section F does not preclude claims for indemnification based on the failure of the conveyor system to meet the requirements of the contract.

Third, Dearborn argues that it need not indemnify Rand because Rand voluntarily paid the liquidated damages to Three Phase. Specifically, it stresses that § 9.3 of the Rand-Three Phase contract, containing a blank for the insertion of the amount of liquidated damages, was never completed. Accordingly, it cites a variety of authority precluding an indemnitee from recovering for the costs of the voluntary settlement of a claim.[3]

---

[3] The cases cited by Dearborn fail to support its argument. *Stewart v. Earle M. Jorgensen Corp*., No. 03-7133, 2005 WL 300420 (10th Cir. Feb. 9, 2005) was decided on the

22

Rand explicitly declines to address Dearborn's settlement argument (Dkt. 78, at 31), arguing instead that it "was in fact legally obligated under its contract with Three Phase for liquidated damages," because that contract incorporated the terms of the Air Force-Three Phase prime contract.

Rand is correct as to the general incorporation provisions. Under § 1.1 of the Three Phase-Rand contract provides that the contract includes both the Agreement itself and the underlying Prime Contract, "and as fully a part of the Subcontract as if attached to this Agreement or repeated herein." Similarly, § 1.2 provides that the General Conditions of the Air Force-Three Phase would also control the relations between Three Phase and Rand.

By themselves, these incorporation provisions might not subject Rand to liability for liquidated damages. The liquidated damage clause in the Prime Contract itself creates only a limited responsibility for liquidated damages, providing [§ 52:211-12] that in the event the work is not completed by a specified time, "the Contractor [*i.e.*, Three Phase] shall pay liquidated damages to the Government." The Three Phase-Rand contract does not alter this limited application of liquidated damages, it confirms it by explicitly defining Three Phase as the "Contractor" and Rand as the "Subcontractor."

However, Article 2 of the contract, providing for "MUTUAL RIGHTS AND RESPONSIBILITIES," further specifies that Three Phase and Rand

> shall be mutually bound by the terms of this Agreement and, to the extent that the provisions of AAA Document A201-2207 apply to this Agreement pursuant to Section 1.2 and provisions of the Prime Contract apply to the Work of the Subcontractor, the Contractor shall assume toward the

---

basis of Arkansas law. *Dodge City Implement, Inc. v. Board of Count Comm'rs of County of Barber*, 165 P.3d 1060, 1064-65 (Kan. App. 2007) did not involve a contractual indemnity claim, but a claim for contribution among joint tortfeasors which was more properly characterized as "proportional post-settlement contribution rather than comparative implied indemnity." 38 Kan.App.2d at 354, 165 P.3d at 1064. The Kansas Court of Appeals held that the comparative fault statute, as well as principles of judicial economy, precluded the settling tortfeasor from commencing a separate action for contribution. In reaching this conclusion, the court stressed that "no commercial or contractual relationship existed between the settling defendant and the governmental entities it sought to pursue for post-settlement contribution." 38 Kan.App.2d at 354, 356, 165 P.3d at 1064, 1066. Thus the relevance of the case is not obvious here.

Subcontractor all obligations and responsibilities that the Owner, under such documents, assumes toward the Contractor, and *the Subcontractor shall assume toward the Contractor all obligations which the Contract, under such documents, assumes toward the Owner* and the Architect. *The Contractor shall have the benefit of all rights, remedies and redress against the Subcontractor that the Owner, under such documents, has against the Contractor,* and the Subcontractor shall have the benefit of all rights, remedies and redress against the Contractor that the Contractor, under such documents, has against the Owner, insofar as applicable to this Subcontract. Where a provision of such documents is inconsistent with a provision of the Agreement, this Agreement shall govern.

(Emphasis added). Thus, under Article 2, Three Phase had the same "rights, remedies and redress" against Rand as the Air Force had against Three Phase — which would include the right to recover liquidated damages.

In light of the agreements between the parties, the court concludes that Rand was legally responsible for the liquidated damages imposed by the Air Force on Three Phase. Under its contract with Dearborn, Rand is entitled to indemnification for the payment of those damages.

### 3. Attorney Fees

Dearborn argues that Rand's claim for attorney fees involved in bringing the present action should be dismissed because the indemnification agreement here, although it does mention attorney fees, was only intended to cover the costs of defending third party claims against Rand, and does not indemnify Rand for its costs in affirmatively bringing a first party claim against Dearborn. The court notes that two of these cases cited by Dearborn are premised on the law of other jurisdictions. See *Polaris Restaurants v. Village Enterprises*, No. 95,807, *2007 WL 281992, *9 (Kan. App. 2007) (contract required application of Missouri law); *Mid Century Ins Co. v. Gates Rubber Co.*, 43 P.3d 737, 729 (Colo. App. 2002). Only the third gives a direct indication of Kansas law. *See Bretches v. Curtis Mach. Co., Inc.*, No. 92,776, 2005 WL 1429904 (Kan. App.), *rev. denied*, 280 Kan. 981 (2005).

In contrast, Rand relies on *Chetopa State Bancshares v. Fox*, 6 Kan.App.2d 326, 333-334, 628 P.2d 249, 256 (1981), in which the purchaser of bank stock sued the sellers under

an indemnification clause for the cost of having to defend two separate federal lawsuits and a tax deficiency claim against the bank. The trial court allowed the indemnitee purchaser to recover attorney fees associated with the federal litigation, but not for the state indemnification action immediately before it. The Court of Appeals reversed, holding that the indemnitee was "entitled to be reimbursed for its attorney fees in this suit, including fees attributable to this appeal." *Id.* at Syl. ¶ 4.

More recently, in *GFSI Canada v. Fletcher Leisure Group*, No. 104, 378, 2012 WL 2045293, (Kan. App. 2012), the court found both *Polaris Restaurants* and *Curtis Machine* "of limited help," as "both cases were clearly dependent on the exact wording of the contract provision." The court ultimately concluded that attorney fees could be recovered in the first party action brought by the indemnitee:

> In our view, three considerations strongly support the district court's interpretation of paragraph 21. First, the plain language of the provision is broadly written—the phrases "indemnify and hold harmless," "from ... any and all claims," "arising out of, resulting from or relating to," and "any breach by Fletcher" stand out for the lack of any apparent limitation. Second, although the word "indemnify" is often used with respect to agreements to reimburse another for claims made by third parties, the word's basic meaning is broad enough to encompass both third-party and direct claims. Black's Law Dictionary defines "indemnify" as "[t]o reimburse (another) for a loss suffered because of a third party's or *one's own act* or default; HOLD HARMLESS." (Emphasis added.) Black's Law Dictionary 837 (9th ed.2009). Black's defines "hold harmless" in a similarly broad way: "To absolve (another party) from any responsibility for damage or other liability arising from the transaction; INDEMNIFY." Black's Law Dictionary 800. Thus, the terms that are used are sufficiently broad to include the claims made here by Gear Canada. Third, one of the provisions in paragraph 21 specifically refers to third-party suits, and in context it's clear that this provision is not applicable to the entirety of the paragraph.

The indemnification clause here is similar to the one in *GFSI* in that both clauses generally promise to "defend, indemnify and hold harmless" the indemnitee "from and against claims, damages, losses and expenses ... arising out of or resulting from" the actions of the indemnitor. Otherwise, however, the clause is notably less broad. There is no equivalent to the broad language noted in GFSI as promising to compensate for "*any and*

*all* claims," or "*any* breach" by Dearborn. Moreover, the clause here does not include the third element, a distinct reference to third party indemnifications claims.

It was this separate reference which played a key role in the court's conclusion, as that paragraph

> provides that when an indemnification claim "involves the claim of any third party," the indemnifying party will have the right to participate in and even control the defense of the claim if it agrees to be responsible for the liability. And that paragraph begins by specifically mentioning a third party: " *If* a claim for indemnification involves the claim of any third party...." (Emphasis added.) By setting off in a separate paragraph one provision specifically dealing only with third-party claims, and by beginning that paragraph with the introduction of a third party, the structure suggests that there are some indemnification claims that do *not* involve third-party claims.

> When we consider the overall structure of section 21 (including its fourth paragraph, on third-party claims) along with the broad language of the indemnity provision (contained in the first two paragraphs) and the general definition of indemnify, we conclude that the parties' contract authorizes the award of reasonable attorney fees in suits between the parties for breach of contract.

2012 WL 2045293, at *15 (emphasis in *GFSI*). Two of these considerations — broad language stressing the ability to recover for "any or all" claims, and other language directly implying that indemnification was restricted to claims advanced by third parties — are not relevant here, which leaves only the third.

"Nationwide, there is no consensus on how courts should approach indemnity clauses in the context of first-party litigation." *TranSched Sys. v. Versyss Transit Solutions*, 2012 WL 1415466 (Del. Super. March 29, 2012) (ultimately concluding that indemnification clauses ordinarily do not "require reimbursement for attorneys' fees incurred as a result of substantive litigation between the parties to the agreement absent a clear and unequivocal articulation of that intent").

Cases which have allowed attorney fee indemnification typically involve broad "any and all" language of the sort noted in *GFSI*. *See e.g., Dalton v. Childress Service Corp.*, 189 W.Va. 428, 432 S.E.2d 98, 102 (1993) (allowing for the recovery of attorney's fees in first party action where the indemnification clause provided for " *any and all* cost and expenses

*including attorneys' fees*") (emphasis in *Dalton*); *RJF Int'l Corp. v. B.F. Goodrich*, 880 S.W.2d 366, 371–72 (Mo.Ct.App.1994) (same result where clause agreed "to indemnify and hold harmless ... from and against *any and all claims*, liabilities, damages, losses, costs and expenses, including without limitation, reasonable counsel fees and disbursements) (emphasis added); *Tack's Steel Corp. v. ARC Constr. Co.*, 821 N.E.2d 883, 890 (Ind.Ct.App.2005) (same result, the court noting the clause was "broad" and created the duty to indemnify for "all losses and liability").

The court finds that Rand may not recover its attorney fees in the present action based on the contract indemnification clause. All of the cases cited by Rand involve particularly broad language indicating an intent to include first party claims. Thus, in *Chetopa State Bancshares*, the relevant exclusion obliged the defendants to indemnify and hold Stuckey harmless "*from and against any loss,* damage, deficiency or expense (including reasonable attorney's fees) suffered or incurred by Stuckey *at any time* after the date hereof, arising from, or as a result or in respect of, the breach of any warranty...." 6 Kan.App.2d at 251, 628 P.2d at 251.

The clause here omits such broad "any and all" language, leaving only the general language of indemnification itself. The general rule is that for attorney fees to be recoverable, "there must be express contractual language" to that effect. *Chetopa State Bancshares*, 6 Kan. App.2d at 334, 628 P.2d at 333. Here, the contract requires that indemnification includes attorney fees, but does not expressly indicate that this right to indemnification includes first party claims by Rand against Dearborn. The court finds that the mere dictionary definition of "indemnification," the second of the *GFSI* considerations, is not enough by itself to authorize an award of attorney fees in the present action.

### 4. Rand's Tort Claims

Dearborn by a separate summary judgment motion seeks a determination that Rand's tort claims, which include negligence and negligent misrepresentation, are

precluded by the economic loss doctrine applied in Kansas. As Dearborn notes, Rand's negligence claim is closely tied to its contract claims, asserting that Dearborn was negligent by failing "to meet the performance requirements of Solicitation No. FA-5004-09-R-C007, and the drawings and specifications and the prime contract … by designing and supplying to Rand conveying equipment that caused the coal to 'back-up' and spill." Rand argues that the economic loss doctrine should not apply in the present action.

Under the economic loss doctrine, a plaintiff seeking recovery for economic losses only cannot proceed under theories sounding in tort. *Professional Lens Plan Inc. v. Polaris Leasing Corp.*, 234 Kan. 742, 675 P.2d 887 (1984). "In other words, where plaintiff has suffered no personal injuries or damage to other property, a cause of action based upon tort does not exist." *City of Winfield v. Key Equipment & Supply*, 2012 WL 1207256, *1 (D. Kan. April 11, 2012) (citing *Lens Plan*, 675 P.2d at 899-99, and noting that Kansas "has consistently applied [the doctrine] in the context of product liability claims"). *See also David v. Hett*, 293 Kan. 679, 270 P.3d 1102, 1109-11 (2011); *Koss Constr. v. Caterpillar, Inc.*, 25 Kan.App.2d 200, 960 P.2d 255, 260 (1998); *Gonzales v. Pepsico, Inc.*, 489 F.Supp.2d 1233, 1243 (D.Kan.2007). "[T]he economic loss doctrine is 'the fundamental boundary between contract law, which is designed to enforce the expectancy interests of the parties, and tort law, which imposes a duty of reasonable care and thereby encourages citizens to avoid causing physical harm to others.'" *Prendville v. Contemporary Homes*, 32 Kan.App.2d 435, 438-39, 83 P.3d 1257 (2004), at 438–39, 83 P.3d 1257 (2004) (quoting Barnett, "Recovery of Economic Loss in Tort for Construction Defects: A Critical Analysis," 40 S.C. L.Rev. 891, 894 (1989)).

Whether a claim sounds in tort or contract is determined by the nature and substance of the facts alleged in the pleadings. *Hett*, 270 P.3d at 1114 (Kan. 2011). If the duty arises from contract, as opposed to an independent duty arising by operation of law, negligence claims are barred by the economic loss doctrine. *Id.*

In its Response, Rand argues the economic loss doctrine has no application because

the Kansas Supreme Court has indicated an intention of restricting the application of the doctrine in *Hett*, 270 P.3d at 1109-11. The court rejects the defendant's argument, which reads the underlying case too broadly. *Hett* concluded that the Kansas Court of Appeals had erred in extending the doctrine to residential service contracts in *Prendiville v. Contemporary Homes*, 32 Kan.App.2d 435, 83 P.3d 1257, *rev. denied*, 278 Kan. 847 (2004). The court held that *Prendiville's* expansion of the economic loss doctrine to residential service contracts "does not square with our long-standing caselaw recognizing that homeowners may sue a construction contractor in tort, contract, or both, depending on the nature of the duty giving rise to the claim." 293 Kan. at 695, 270 P.3d at 696. Not only was *Prendiville* inconsistent with prior Kansas law, it did not fit within the rationale for the economic loss doctrine, which recognizes that contract and warranty law are better suited for claims when the only damage is to the product itself because: (1) those losses are easily insured; (2) restricting the parties to the contractual remedies allows the parties to allocate the risk through the bargaining process; and (3) warranty damages are sufficient to cover the injury. 293 Kan. at 699, 270 P.3d at 1113 (citing *East River S.S. Corp. v. Transamerica Delaval*, 476 U.S. 858, 866, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986)).

The court specifically recognized that the residential services contracts at issue there would fall outside the warranty provisions of the U.C.C., the latent "nature of home defects" tends to obscure timely discovery, and that such construction contracts "rarely involve the sophisticated parties" typical of commercial products cases. *Id.* Rather than a far-reaching rejection of the economic loss doctrine, *Hett* reflects a particularized determination that the doctrine should not displace existing case law, given the distinct nature of residential service contracts.

These distinctive elements are missing here. Existing Kansas case law is not inconsistent with the economic loss doctrine; it strongly supports its application. *See Koss Constr. v. Caterpillar, Inc.*, 960 P.2d 255, 260 (Kan.Ct.App.1998). Further, the defendant makes no credible contention that the underlying economic transaction was anything other

than a sophisticated commercial transaction between experienced business entities. The design and supply of the coal conveyor system was subject to explicit contractual specification and warranty, which more appropriately balance the rights of the parties.

Rand also argues that various cases discussing the economic loss doctrine are distinguishable here because "there is not privity of contract … in those cases," and do not involve a professional duty of care. (Dkt. 63, at 9). But while these cases did not themselves involve parties in direct privity, this factor was never decisive in the decision to apply the economic loss doctrine. Indeed, to the extent that contracting parties, such as Rand and Dearborn, are in direct privity, the doctrine has even more force, as it falls more squarely within doctrine's goals of requiring the parties to allocate the risk through the bargaining process and to seek relief through the express agreements and warranties of their contract. Rand's claims of negligence and negligent misrepresentation — which are grounded purely on the failure to meet contract specifications and devoid of any claims of professional malpractice — are subject to the economic loss doctrine.

Even if such a professional services claim was advanced in the case, the court is persuaded that the economic loss doctrine would remain applicable. *See BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66 (Colo. 2004) (economic loss doctrine precluded subcontractor's claim against engineering firm); *Rissler & McMurry Co. v. Sheridan Area Water Supply Joint Powers Bd.*, 929 P.2d 1228 (Wyo.1996) (same).

> If tort and contract remedies were allowed to overlap, certainty and predictability in allocating risk would decrease and impede future business activity. The construction industry in particular would suffer, for it is in this industry that we see most clearly the importance of the precise allocation of risk as secured by contract. The fees charged by architects, engineers, contractors, developers, vendors, and so on are founded on their expected liability exposure as bargained and provided for in the contract.

*Berschauer/Phillips Constr. Co. v. Seattle School Dist. No. 1*, 124 Wash.2d 816, 826-27, 881 P.2d 986, 992 (1994). Rand and Dearborn are both sophisticated business entities. They are and

were able to define their obligations through their contractual agreements, and this

precludes Rand's current claims for negligence and negligent misrepresentation.

Finally, Rand cites *State ex rel. Stephan v. GAF Corp.*, 242 Kan. 152, 160, 747 P.2d 1326 (1987) for the proposition that generally Kansas law requires an election of remedies only when the claims are inconsistent. But while this is true as a general rule of pleading, it does not immunize Rand's tort claims from the otherwise applicable economic loss doctrine.

### B. Arch's Quantum Meruit Claims

Dearborn has moved for summary judgment on Arch's *quantum meruit* claim, which seeks to recover from Dearborn for the value of the redesigned system which it delivered to Rand. Dearborn argues that such quasi-contract claims are excluded where the parties have otherwise agreed to reduce their obligations to an express contract. *See Raab Sales, Inc. v. Domino Amjet, Inc.*, 530 F.Supp.2d 1192, 1199 (D. Kan. 2008). Alternatively, it argues that such a claim is precluded by the September 17, 2010 letter from Archer to Dearborn in which he stressed that his company had provided the extra work for Rand "at no extra cost to Dearborn."

Arch responds to Dearborn's motion with a single sentence, promising to "continue pursuing its quantum meruit claim." (Dkt. 59, at 1). While the Response thus has the merit of concision, it fails to present any facts, argument, or legal support for the denial of Dearborn's motion. Under D.Kan.R. 56.1, "All material facts set forth in the statement of the movant will be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party." *See Ferraro v. Board of Trustees*, 106 F.Supp.2d 1195, 1203 (D.Kan. 2000) (a plaintiff 's failure to provide evidence in response to summary judgment was fatal to his claim). Further, when presented with colorable summary judgment argument against a given claim, the respondent must supply some responsive argument. *See Jones v. Rent-A-Center*, 240 F.Supp.2d 1167, 1174-75 (D.Kan. 2002) (plaintiff who responds to summary judgment motion but "offers no legal argument

or authority in support [has] abandoned her claims").

The court hereby grants Dearborn's motion as to Arch's *quantum meruit* claim.

C. *Arch's Motion as to Dearborn's Contract and Tort Claims*

Finally, Arch seeks summary judgment as to the contract and tort claims advanced by Dearborn. First, it contends that Dearborn's indemnification claim against it must fail, because any such claim is premised on the Purchase Order sent by Dearborn after the parties had already formed a contract. That is, Arch alleges that the contract arose on November 11, 2009, when Dearborn issued an Advanced Bill of Materials in response to Arch's Quotation. The Purchase Order, it alleges, cannot form a part of the contract because it reflects a material alteration of the agreement under K.S.A. 84-2-207(2). Second, Arch alleges that Dearborn cannot obtain liquidated damages under the U.C.C., because such damages would be consequential damages under K.S.A. 84-2-715, and could be recoverable only if Arch was aware of those damages at the time of the Advanced Bill of Materials. Third, Arch contends that Dearborn's tort claims are precluded by the economic loss doctrine.

The court finds that Arch has failed to establish that the Purchase Order was not a part of the contract between the parties. Here, the Terms and Conditions in the Purchase Order were similar to other purchase orders used between Dearborn and Arch in the past . The Advanced Bill of Materials was issued in conjunction with a note that a "P.O." or Purchase Order would be issued promptly. The Advanced Bill of Materials itself explicitly provides that specification drawings would be issued within two weeks "after the issuance of purchase order." The title of the document itself — as an *Advanced* Bills of Materials — further suggests that the document by itself was not intended to be the complete agreement between the parties. And Arch's personnel testified the Purchase Order was what Arch "received, accepted, and relied upon as the deal."

Substantial evidence therefore supports the factual conclusion that the parties

intended the Purchase Order to be a part of their agreement. Accordingly, because Arch has not shown beyond a reasonable doubt that the parties either meant to exclude the Purchase Order from their agreement or that a complete contract was adopted prior to the Purchase Order, the court finds that Arch is not entitled to summary judgment.

Here, the Purchase Order contains express indemnification and warranty clauses. Prior to the agreement, Dearborn had sent Arch a full set of the specifications for the Air Force project — including the provision for liquidated damages. The court holds that, under the facts of the case, the resulting responsibility Dearborn may incur to Rand for liquidated damages is a "loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know" within the meaning of K.S.A. 84-2-715(2)(a), and may be properly assessed against Arch.

Finally, the court notes that Dearborn does not oppose Arch's motion to dismiss the tort claims in the action, urging that, consistent with its argument against Rand's tort claims, "that the Court should find that all tort claims in this action are barred." As noted earlier, the court finds this is the appropriate result in light of Kansas law and the facts of the case.

Thus, the court grants summary judgment in favor of Rand as to the existence of a breach of its contract with Dearborn, and that Rand is entitled to indemnification for the liquidated damages it paid to Three Phase. Rand is not entitled to its attorney fees incurred in bringing the present action. The court dismisses the tort claims of all parties, as well as Arch's *quantum meruit* claim. The court denies the other motions before it.

IT IS ACCORDINGLY ORDERED this 6th day of May, 2013, as to the pending Motions for Partial Summary Judgment, that Dearborn's *Quantum Meruit* and Tort motions (Dkt. 49, 51) are hereby granted, while the remaining motions (Dkt. 47, 50, 52) are hereby granted in part and denied in part as provided herein.

 s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE